# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

———————

No. 02-3390

———————

United States of America,                       *

                                         *

        Plaintiff - Appellant,        *

                                         *   Appeal from the United States

   v.                              *   District Court for the

                                       *   Northern District of Iowa

Joel Gerard Ameling; Tina Brown,   *

                                       *

        Defendants - Appellees.    *

———————

Submitted: March 12, 2003
Filed:  May 8, 2003

———————

Before HANSEN,[1] Chief Judge, LOKEN and MURPHY, Circuit Judges.

———————

MURPHY, Circuit Judge.

Joel Gerard Ameling and Tina Brown are charged with conspiracy to manufacture and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.  Additional charges brought against Ameling are possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), manufacturing or attempting to manufacture

———————

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003.  He has been succeeded by the Honorable James B. Loken.

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, maintaining premises for the purpose of manufacturing, distributing, or using methamphetamine, in violation of 21 U.S.C. § 856(a)(1), and possession of a firearm by a user of a controlled substance, in violation of 21 U.S.C. §§ 922(g)(3) and 924(a)(2). The defendants moved to suppress evidence obtained after their vehicle was stopped, claiming that their Fourth Amendment rights had been violated because the police lacked reasonable suspicion to make the stop. The district court granted the suppression motions, and the government appeals. We reverse.

On September 19, 2001, Mike Van Pelt, the lead security officer for the Target store in Fort Dodge, Iowa, was in his office monitoring the store with video surveillance equipment when he saw Ameling and Brown walk together to the area where pseudoephedrine products were displayed. He watched the two each select two boxes of pseudoephedrine and later testified that he continued to keep them under observation because the store had suffered a substantial amount of pseudoephedrine theft. He observed them walk toward the checkout lanes and then split up, each going to a different cashier. He testified that there were no long checkout lines because it was midafternoon and to his knowledge Target was not having a sale on pseudoephedrine. Van Pelt saw Brown pay first, walk out alone, and then wait for Ameling by his truck in the parking lot. After Ameling went out, both defendants placed their Target bags in the tool box located in the back of the truck.

Van Pelt was suspicious. He had completed a training course given by the Fort Dodge police department where he had been taught that pseudoephedrine was used to manufacture methamphetamine illegally. He had also learned that people involved in this type of manufacturing often split purchases of pseudoephedrine or other necessary supplies among themselves and different stores to avoid attracting suspicion. After he saw Ameling and Brown place their Target bags in the tool box, Van Pelt called Lieutenant Dennis Mernka and Officer Ryan Doty of the Fort Dodge

-2-

police, described what he had seen,[2] and gave a detailed description of the defendants and the truck. While he was on the phone with the police, Van Pelt saw the defendants drive across the street to a Hy-Vee store and reported this as well.

The police officers set out for the Hy-Vee in an unmarked police car and called ahead to a pharmacy employee. Officer Doty described the defendants to her and said they might be buying methamphetamine precursors, including lithium batteries. He asked her to find out what they were purchasing. The employee called back several minutes later and reported that the defendants had been in the battery aisle and had purchased a lithium battery. When the officers arrived at the Hy-Vee, they parked and waited until the defendants came out, got in the truck, and drove away.

The officers followed the truck out of the lot and decided to stop it. Mernka testified that their training and experience had caused them to suspect that the defendants were involved in manufacturing methamphetamine and attempted to conceal their illegal activity by dividing purchases of precursors between themselves and between stores. The officers stopped the truck a short distance from the Hy-Vee. After some preliminary questions and checks for registration and warrants, they questioned each defendant separately. Ameling told Lieutenant Mernka that the two had come to town to shop but had not been looking for anything in particular and that they had to hurry home to pick up a child. He denied purchasing anything at Target when asked and said that he did not remember buying anything at Hy-Vee. Meanwhile, Brown told Officer Doty that the two had been in town because she had a doctor's appointment; she did not mention a child. She also stated that they had bought only donuts and a soft drink at Hy-Vee and that she had been looking at shoes at Target but had not purchased anything there.

---

[2]Van Pelt testified that he could not recall whether he had told the officers that the defendants had placed the boxes of pseudoephedrine in the tool box in the back of the truck.

The officers conferred and discovered that the defendants had given inconsistent accounts of their time in town. Lieutenant Mernka asked permission to search the truck, and Ameling refused. Mernka then told the defendants to get out of the truck, and the officers searched it. Under the front seat, Mernka found two boxes of pseudoephedrine; hose clamps; a Hy-Vee bag containing a nine volt alkaline battery and a receipt for the battery, donuts, and soda; and a cigarette pack. Mernka testified that he could see that the battery was not a lithium battery as soon as he pulled the items out from underneath the seat. Inside the cigarette pack the officers found a plastic bag and a glass vial, each containing methamphetamine. In the tool box in the back of the truck were six boxes of pseudoephedrine, rubber hosing, and a 20 gallon propane tank. Ameling and Brown were arrested for possession of methamphetamine and methamphetamine precursors.

After the arrest but before Ameling had been informed of his <u>Miranda</u> rights, Lieutenant Mernka smelled anhydrous ammonia, another methamphetamine precursor. Mernka asked Ameling whether there was any anhydrous ammonia in the propane tank found in the tool box. At first Ameling did not respond, but Mernka explained that the question was important because he needed to know whether to take safety precautions. Ameling replied that he did not think the tank contained any anhydrous ammonia at that moment, but that it had in the past. A test later confirmed that there was a detectable amount of anhydrous ammonia in the tank.

The officers took the defendants to the police station. While Doty was completing paperwork, Ameling made several statements attempting to exonerate Brown and to take responsibility for the items in the truck. The officers asked him whether he would like to make a taped statement, and he said yes. Officer Doty advised him of his <u>Miranda</u> rights, which Ameling acknowledged and waived. Ameling then said that he had asked Brown to buy the pills and that she did not know how they were going to be used. He also said that she was unaware that there was methamphetamine in the truck. He stated that he was addicted to methamphetamine

and claimed that he had obtained the items found in the truck to trade for drugs, not to manufacture methamphetamine himself. Later that day, a search warrant was obtained for Ameling's residence in Fort Atkinson, Iowa. Police found there numerous items used in the manufacture and distribution of methamphetamine as well as a number of firearms, most in plain view.

The defendants filed motions to suppress, arguing that both the initial stop and the subsequent search of the truck violated the Fourth Amendment.[3] Ameling argued in addition that his statements before being advised of his rights were inadmissible under the Fifth Amendment and that his tape recorded statement should be excluded because it was fruit of the poisonous tree. He also contended that the search warrant did not authorize authorities to seize firearms from his home.

The motions were first heard by a United States magistrate judge who concluded that the officers lacked reasonable suspicion to stop the truck and lacked probable cause to search it. He recommended that the evidence found in the truck and Ameling's home and all his statements should be suppressed as fruits of an illegal stop and search. The government filed objections, arguing that the officers' suspicion was reasonable given the information they had and that they also had probable cause to search the vehicle.

The district court reviewed the report and recommendation de novo. It considered the defendants' acts in Target and Hy-Vee to be open to innocent explanation and concluded that the officers did not have reasonable suspicion of criminal activity to stop the truck. It granted the motions to suppress, concluding that the evidence found in the truck, Ameling's statements, and the evidence found in his

_____

[3]Even though Brown did not own the vehicle, as a passenger she may still "challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity." United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

residence had all been tainted by an illegal stop and should be suppressed as fruits of the poison tree under Wong Sun v. United States, 371 U.S. 471, 488 (1963).

The government argues on its appeal that the district court erred by suppressing the evidence because the officers had reasonable suspicion to stop the truck and talk with the defendants, and then obtained probable cause to search it. We have jurisdiction over this interlocutory appeal pursuant to 18 U.S.C. § 3731. We review the district court's factual findings for clear error and its conclusion that the Fourth Amendment was violated de novo. United States v. Morgan, 270 F.3d 625, 630 (8th Cir. 2001).

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; Payton v. New York, 445 U.S. 573, 576 (1980). An investigatory stop is considered a seizure within the meaning of the Fourth Amendment and must be "supported by reasonable suspicion to believe that criminal activity may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). A reviewing court must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Id. In forming a basis for suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). While "an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id. at 274 (internal quotation marks and citation omitted).

We conclude after examining the record here that the officers' suspicion that the defendants were involved in criminal activity was reasonable. Before the stop they had learned that the defendants purchased a significant amount of pseudoephedrine, known to be a methamphetamine precursor, and split the purchase into two separate transactions. Although the defendants entered Target together, they split up after selecting their purchases and went to separate registers even though the store was not busy. The officers further knew that the defendants had not left Target together, but had reunited only after they were back at Ameling's truck. The officers were also aware that immediately after leaving Target, the defendants had traveled to a nearby store to make further purchases. They were told by an employee there that the defendants had purchased a lithium battery, another methamphetamine precursor. Moreover, the fact that Van Pelt, the Target security officer, had had special training on methamphetamine manufacturing added an indicium of reliability to his report.

While each individual action taken by the defendants could be susceptible to innocent explanation, their behavior must be considered as a whole and in the light of the officers' "experience and specialized training." Id. at 273. Here, Lieutenant Mernka's experience and training—he had over 14 years experience as a law enforcement officer and had spent six years in the narcotics investigations unit—indicated that the defendants' actions were consistent with those of methamphetamine manufacturers trying to disguise their illegal operations. On this record, we cannot conclude that the officers' suspicion of criminal activity was unreasonable.

Brown argues that her detention at the scene was illegal, but once a lawful stop has occurred, officers are entitled to conduct an investigation "'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)); see United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

-7-

Here the officers' original stop of the defendants and attendant questioning lasted no longer than reasonably necessary to investigate their suspicion that the defendants had been purchasing methamphetamine precursors for an illegal purpose. The officers knew that the defendants had purchased a sizable amount of pseudoephedrine and appeared to have taken steps to conceal their purchases. By the time the officers discovered that the battery was not lithium but alkaline, the defendants had lied and told inconsistent stories about their activities. We conclude that the investigatory stop and subsequent detention were constitutionally reasonable when all the circumstances are considered.

Ameling also urges us to affirm the suppression order on the ground that the search of the truck was constitutionally impermissible. We decline to do so. Law enforcement officials may search a vehicle without a warrant so long as they have probable cause. United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (per curiam). Probable cause "exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Id. In this case, the defendants, after being pulled over, lied and gave inconsistent accounts of their time in town. Ameling reported that they had been in town to shop, whereas Brown said they were there for a medical appointment. Ameling said they were in a hurry to pick up a child, but Brown made no mention of a child. Ameling said that he did not remember buying anything at Hy-Vee even though he had just purchased something there moments earlier, while Brown maintained that they had bought only donuts and a soft drink. Neither defendant admitted to purchasing anything at Target or to buying a battery at Hy-Vee. Combined with the facts justifying the initial stop, these apparently false statements and inconsistent stories were sufficient to give the officers probable cause that the defendants were involved in criminal conduct. Cf. Morgan, 270 F.3d at 631 (contradictory statements are "indicators of criminal activity"); Booker v. Ward, 94 F.3d 1052, 1058 (7th Cir. 1996) ("lying about an incriminating fact can indicate guilt" and helps to establish probable cause). Based on this record,

the search was not unconstitutional and the suppression order cannot be affirmed on the alternate basis urged by Ameling.

For these reasons, we conclude that the district court erred by granting the defendants' motions to suppress, and we reverse and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.