123 P.3d 891 (2005)
130 Wash.App. 589
STATE of Washington, Respondent and Cross-Appellant,
v.
Jeffrey Otto CARLSON, Appellant.
No. 22775-8-III.
Court of Appeals of Washington, Division 3, Panel Two.
December 1, 2005.
*892 Dennis W. Morgan, Attorney at Law, Ritzville, WA, for Appellant.
Barrett J. Scudder, Adams County Prosecutor's Office, Ritzville, WA, for Respondent.
SCHULTHEIS, J.
¶ 1 Jeffrey Otto Carlson and Joey Owens entered a rural store. Each separately bought an unremarkable amount of a different product that can be lawfully possessed and purchased. The store's manager knew that when mixed together and also combined with a number of other substances, the two products purchased by Mr. Carlson and Mr. Owens  muriatic acid and denatured alcohol  could be used to make methamphetamine. The manager called police. An officer stopped the vehicle in which Mr. Carlson and Mr. Owens were then traveling and ultimately discovered pseudoephedrine.
¶ 2 Mr. Carlson was charged with possession of pseudoephedrine with intent to manufacture methamphetamine. His motion to suppress was denied and he was convicted. He appeals, claiming the stop was unlawful. We conclude that because police did not have reasonable suspicion of criminal activity, it was improper to stop Mr. Carlson's vehicle and the evidence should have been suppressed. We therefore reverse his conviction and dismiss.

FACTS
¶ 3 Robert Boyce, the manager of Potter Drug in Othello, Washington, saw two men, Mr. Carlson and Mr. Owens, enter the store on May 22, 2003. He was suspicious of them by their appearance and by the way they acted. The two men were "rough dressed, unkempt and dirty." Clerk's Papers (CP) at 58. Upon entering the store, one man went to the sundries section of the paint shop while the other went to another area. The man in the paint shop area declined Mr. Boyce's offer of assistance. As soon as the first man paid for his item and left the store, the other man bought his item and left the store. One man bought a container of muriatic acid and the other bought a container of denatured alcohol.[1]
¶ 4 Mr. Boyce testified that he knew from his training through a local law enforcement program that the items the men purchased were ingredients for the manufacture of methamphetamine and that those attempting to buy methamphetamine components tend to be elusive and decline help in locating the products in the store because they do not want to be noticed. He recorded the license plate number of the vehicle the men were driving and noted the vehicle description.
¶ 5 Mr. Boyce then called police and identified himself to a police dispatcher and reported *893 what he had observed. The call was dispatched to Bo Lamens, a police officer with the Othello Police Department. Officer Lamens located the car bearing the reported license number, and noted the vehicle and its occupants matched the description provided by dispatch. He then stopped the car.

ANALYSIS
¶ 6 We review the trial court's findings of fact on a motion to suppress for substantial evidence. State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994). Substantial evidence exists if the evidence in the record is sufficient to persuade a fair-minded, rational person of the truth of the court's finding. Id. at 644, 870 P.2d 313. We review the conclusions of law de novo. State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996).
¶ 7 An officer may briefly detain occupants of a vehicle for investigation if the circumstances satisfy the Terry[2] stop reasonable suspicion standard. State v. Mendez, 137 Wash.2d 208, 220, 970 P.2d 722 (1999). Our state and federal constitutions require officers making a valid Terry stop to be able to identify specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant the intrusion. Id. at 223, 970 P.2d 722 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Articulable suspicion means "a substantial possibility that criminal conduct has occurred or is about to occur." State v. Kennedy, 107 Wash.2d 1, 6, 726 P.2d 445 (1986) (citing 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2, at 65 (1978)).
¶ 8 Reasonableness is determined from the totality of the circumstances known by the officer at the inception of the stop. State v. Glover, 116 Wash.2d 509, 514, 806 P.2d 760 (1991); State v. Jones, 117 Wash. App. 721, 728, 72 P.3d 1110 (2003), review denied, 151 Wash.2d 1006, 87 P.3d 1184 (2004). The factual basis for an investigatory stop need not arise out of the officer's personal observation, but may be supplied by information acquired from another person. Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Police may rely on information known to its agency and relayed through dispatch. State v. Gaddy, 114 Wash.App. 702, 706, 60 P.3d 116 (2002), aff'd, 152 Wash.2d 64, 93 P.3d 872 (2004); State v. Mance, 82 Wash.App. 539, 542-44, 918 P.2d 527 (1996).
¶ 9 Mr. Carlson argues that what was known to law enforcement was not enough to amount to reasonable articulable suspicion. We agree.
¶ 10 A number of courts have found that similar purchases of legitimate and innocuous items were an insufficient basis for reasonable suspicion of criminal activity. For instance, in State v. Bergerson, 659 N.W.2d 791, 793-94 (Minn.Ct.App.2003), police stopped a driver after the owner of a hardware store reported that he purchased rubber tubing and acetone, items used to manufacture methamphetamine. A Minnesota appellate court held:
Prior to the seizure, Deputy Carlson knew only that Bergerson had purchased common, everyday items from the hardware store that can also be used for an unlawful purpose.... Absent any other activity or information about Bergerson, merely purchasing two generic items from a hardware store, which separately and together have numerous legitimate uses, does not create reasonable suspicion of criminal activity.
Id. at 796.
¶ 11 In this case, other than knowing that the innocuous items were purchased, police had some information about the shopping practices and current grooming of the occupants of the car. These matters, when coupled with the purchase of lawful goods, are inadequate to substantiate reasonable suspicion.
¶ 12 With respect to shopping practices, the act of entering a store with a companion and then splitting up to purchase pseudoephedrine products is a suspicious activity often seen in methamphetamine manufacture litigation, and it frequently serves to support investigative stops in published cases. E.g., United States v. Ameling, 328 F.3d 443 (8th *894 Cir.), cert. denied, 540 U.S. 961, 124 S.Ct. 422, 157 L.Ed.2d 301 (2003); State v. Bulington, 802 N.E.2d 435 (Ind.2004); State v. Heuser, 661 N.W.2d 157 (Iowa 2003); State v. Schneider, 32 Kan.App.2d 258, 80 P.3d 1184 (2003). But that activity has not been documented in cases involving the purchase of anything other than pseudoephedrine products.[3] In Schneider, a Kansas appellate court affirmed the trial court's suppression of evidence, in the presence of the seemingly suspicious activity of separating to make purchases of pseudoephedrine products, noting that it agreed with the trial court's characterization as "`scary'" that articulable suspicion could be derived from a perfectly legal transaction. Schneider, 80 P.3d at 1189.
¶ 13 Moreover, that Mr. Carlson and Mr. Owens entered this particular store together and then made separate selections and purchases of legitimate items was certainly not suspicious or even atypical. The store manager conceded that it was not unusual for two or more people to enter into the store and then separate to shop. Report of Proceedings (Oct. 9, 2003) (RP) at 12-13.
¶ 14 As for the suspects' appearance, while a person's appearance might be a legitimate factor in deciding whether police have reasonable suspicion of criminal activity to support an investigative stop, such in itself is not sufficient. United States v. Betemit, 899 F.Supp. 255, 261 (E.D.Va.1995) (citing Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)), aff'd by unpublished opinion, 129 F.3d 117 (4th Cir.1997). Appearance is not used to stereotype physical characteristics with criminal conduct or propensity, but to assess suspicion in the context of the situation at hand. Id. See, e.g., United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir.1993) (holding that the fresh and well dressed appearance of men who arrived via bus to New York City advanced establishment of articulable suspicion). There was nothing compelling about the description of the men that is relevant to the context here. The store manager testified that it was not unusual to see customers that were "dressed rough" or not "dressed their best" in the store. RP at 12.
¶ 15 Courts in other jurisdictions have held that police lacked reasonable suspicion in similar innocuous item cases when they have insufficient additional facts to support the stop.
¶ 16 In State v. Abeln, 136 S.W.3d 803, 807 (Mo.Ct.App.2004), police received a report from a store that a man picked up a case of engine starter fluid as if to purchase it, but set it down once he realized he was attracting the attention of store employees and instead purchased a single can. The employees also reported that the man had purchased funnels and hoses earlier in the week. Knowing that these items are used in the manufacture of methamphetamine, an officer stopped the man who was then driving on the highway. An appellate court in Missouri held that these facts, based entirely on items that had legitimate uses, did not add up to reasonable suspicion of criminal activity. Id. at 812.
¶ 17 In State v. Knight, 33 Kan.App.2d 325, 104 P.3d 403, 404 (2004), a Kansas appellate court held that an investigatory stop was not lawful where a man bought two boxes of cold pills, a six-pack of bottled water, and table salt. The court held that although salt was a methamphetamine ingredient and suspicious when purchased in addition to pseudoephedrine, it was too ubiquitous a substance upon which to base an investigatory stop. Id. at 405. Here, the store manager testified that muriatic acid was lawful to sell and no prescription was required for its purchase. RP at 11-12. Mr. Boyce testified that muriatic acid and denatured alcohol have some farming and industrial uses. RP at 12. While the substances in this case are not as ubiquitous as salt, nothing in the record indicates that the purchase of either of these products is inherently suspicious or that members of the public in general or Mr. Carlson specifically *895 would be particularly unsuitable purchasers. We are not inclined to take judicial notice of this. See ER 201.
¶ 18 The number of items purchased in this case is in contrast to those cases in which the items the defendants purchased constituted a nearly complete methamphetamine recipe. E.g., State v. Odom, 872 So.2d 887, 889 (Ala.Crim.App.2003) (finding reasonable suspicion where defendant purchased "2 bottles of propane fuel, a set of stainless steel cookware, 4 packages of lithium batteries, 3 boxes of Equate brand cold and allergy medication, 4 boxes of Sudafed cold and allergy medication, and 12 bottles of antifreeze").
¶ 19 The suppression record does not specify the quantity of the products purchased and there was no indication that information was related to the police. At oral argument, however, defense counsel used for illustrative purposes containers of an unremarkable size when discussing the modest quantity of product purchased. See RAP 11.4(i). The State did not object. Suffice it to say, this case differs from those in which large quantities of products were purchased. E.g., United States v. Araque, 255 F.Supp.2d 1010 (D.Neb.2003) (stop proper where couple attempted to purchase an unusually large amount of iodine (two gallons) and then purchased unusual quantities of cold medicine with pseudoephedrine at two different stores within a very short time).
¶ 20 This case also differs from others in which store employees called police when they believed customers were purchasing ingredients to manufacture methamphetamine where the purchases involved pseudoephedrine, a regulated substance, and/or police had an independent reason to stop the person such as a traffic infraction or suspicion of shoplifting. E.g., Ameling, 328 F.3d 443 (investigatory stop proper where two persons shopped together but split up to purchase pseudoephedrine products and then immediately went to a nearby store for a lithium battery); United States v. Townsend, 330 F.3d 438, 441 (6th Cir.2003) (stop proper where two people bought pseudoephedrine, lithium batteries, camping fuel, and coffee filters, and officer knew that the car driven by the purchasers was recently involved in theft of anhydrous ammonia and the registered owner of the vehicle was involved in an explosion at an alleged methamphetamine lab); United States v. Martinez, 808 F.2d 1050 (5th Cir.1987) (stop proper where defendant purchased all chemicals needed for crystal methamphetamine and defendant drove erratically); United States v. Fisher, 241 F.Supp.2d 1154, 1163 (D.Kan.2002) (stop proper where defendant stashed 10 packages of lithium batteries in snack area of store when it was apparent that he realized he was under suspicion for attempting to shoplift them and then went to a neighboring store and engaged in what appeared to be counter-surveillance), aff'd by unpublished opinion, 99 Fed.Appx. 190 (10th Cir.2004); Heuser, 661 N.W.2d 157 (reasonable suspicion found where two people shopped together, split up to purchase pseudoephedrine products at numerous stores and then went to another store where one bought pseudoephedrine and the other inquired about lithium batteries); State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App.2002) (court found reasonable suspicion where couple made repeated trips into the store buying pseudoephedrine products and then drove evasively).
¶ 21 We cannot countenance an investigative stop on the purchase of these lawful products on this record.

CONCLUSION
¶ 22 We reverse the conviction and dismiss. Accordingly, we need not address the State's sentencing issue on cross-appeal.
I CONCUR: KATO, C.J.
BROWN, J. (dissenting).
¶ 23 Purchasing materials commonly used in the methamphetamine manufacturing process need not, as Jeffrey Carlson suggests, include psuedoephedrine products to arouse a reasonable articulable suspicion of criminal activity. "[I]nnocent behavior frequently will provide the basis for a showing of probable cause" and, it logically follows that innocent behavior can support the reduced showing of reasonable suspicion. Illinois v. Gates, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Moreover, reasonable *896 suspicion need not "rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 272, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).
¶ 24 Substantial evidence supports the trial court's suppression findings. Officer Bo Lamens initiated an investigative car stop based upon information relayed from Robert Boyce. Mr. Boyce managed Potter's Drug Store and was law enforcement trained in identifying persons and circumstances suspicious for methamphetamine manufacture. Mr. Boyce called the Othello Police Department, identified himself, described the suspects, and gave their vehicle license number. In detail, he reported the pair appeared hostile, refused help, split up, and did not want to be noticed. Mr. Owens bought a gallon of muriatic acid. After Mr. Owens left the store, Mr. Carlson bought a gallon of denatured alcohol. The circumstances corresponded to his training.
¶ 25 Given the above, the trial court properly concluded "the identified citizen informant gave an extensive and detailed recitation of facts upon which he based his conclusion that the two individuals he observed were purchasing chemicals for the production of methamphetamine." Clerk's Papers (CP) at 64. Further, relying on State v. Anderson, 51 Wash.App. 775, 780, 755 P.2d 191 (1988), the trial court concluded the facts "gave rise to a well founded articulable suspicion" of criminal activity. Id.
¶ 26 The trial court correctly reasoned Mr. Boyce was "known to law enforcement" and gave detailed facts supporting his "conclusion that [Mr. Owens and Mr. Carlson] were purchasing precursors for the production of methamphetamine." CP at 65. Officer Lamens was alerted "due to his experience and training that the items purchased were those commonly used as precursors for the production of methamphetamine." Id. While other uses are possible for muriatic acid and denatured alcohol, it is conceded the purchased items are commonly used for methamphetamine manufacture. Mr. Carlson merely quibbles over whether they are technically precursors.
¶ 27 In sum, a rule requiring the presence of a psuedoephedrine product in order to establish reasonable suspicion goes too far. Psuedoephedrine is, after all, just another innocent product recognized as a precursor in the process of manufacturing methamphetamine. Even so, purchasing a suspicious combination of products did not alone support Officer Lamens' investigatory stop. Mr. Boyce additionally described specific suspicious behavior. The trial court concluded the combined circumstances supported a reasonable, articulable suspicion for an investigatory stop. I would hold the trial court did not err.
¶ 28 Accordingly, I respectfully dissent.
NOTES
[1] The findings of fact specify the purchases as muriatic acid and denatured alcohol. CP at 59. Mr. Boyce could not recall the items purchased. He said "they purchase[d] ... either like a muriatic acid, an acetone, or a paint thinner." Report of Proceedings (Oct. 9, 2003) (RP) at 5-6; see also RP at 7 ("the acetone or the thinner that they had purchased"); RP at 10 (recounting report to dispatcher in which he said that the men purchased muriatic acid or a paint thinner). In fact, no witness could identify the items that were purchased by the two men. RP at 19 (police dispatcher could not recall the items that Mr. Boyce told her the men purchased); RP at 25 (officer responding to the call could not name items the men purchased). Nonetheless, Mr. Carlson does not challenge this finding or the others relating to the muriatic acid or denatured alcohol. We consider only those facts to which error has been assigned. State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994). Therefore, this finding is a verity. Id. at 644, 870 P.2d 313.
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] In Ameling, the Eighth Circuit observed, "people involved in this type of manufacturing often split purchases of pseudoephedrine or other necessary supplies among themselves and different stores to avoid attracting suspicion." Ameling, 328 F.3d at 445. However, we have not been able to find any published case that involves split purchases of any other methamphetamine manufacturing supplies besides pseudoephedrine.