# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3258

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Rigoberto Valle Cruz, also known as | * | District of Nebraska. |
| Abraham Orona Saez; Angelina A. | * | |
| Alford, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: February 14, 2006
Filed: July 3, 2006

_____

Before LOKEN, Chief Judge, BOWMAN and SMITH, Circuit Judges.

_____

BOWMAN, Circuit Judge.

The United States appeals from the order of the District Court granting the suppression motions filed by Rigoberto Valle Cruz and Angelina Alford. See 18 U.S.C. § 3731 (2000) (allowing the government to appeal a suppression order before final judgment under certain conditions where the evidence in question "is a substantial proof of a fact material in the proceeding"). We reverse and remand the case for further proceedings.

The traffic stop that set in motion the events leading up to the suppression order took place on January 14, 2005, on Interstate 80 in Dawson County, Nebraska. Much of the relevant activity was videotaped by the Nebraska State Patrol trooper who made the stop. At about 3:30 in the afternoon, Trooper Chad Phaby[1] pulled over a westbound Ford Expedition SUV for speeding. Within seconds after the Expedition pulled over, a white Daewoo automobile went past on the highway, pulled onto the shoulder, and stopped some distance, perhaps 1000 feet, in front of the SUV and the patrol car. Phaby approached the SUV and asked the driver, who Phaby later learned was Valle Cruz, for his license, the vehicle's registration, and proof of insurance. Observing the interior of the SUV, Phaby saw a radar detector; deodorizers; fast food trash; and blankets, pillows, and clothing in the back, but no luggage. When asked, Valle Cruz said that the Daewoo driver was his girlfriend. Phaby asked Valle Cruz to pull up behind the car; Phaby pulled up his patrol car as well.

Phaby noted the California license plates and called the license and registration information into dispatch. The license bore the name "Abraham Oronosaez," whose criminal history was reported to Phaby as including an arrest for first degree murder in Puerto Rico. The SUV was registered to "Alma Lugo" but had not been reported stolen.

Phaby returned to the SUV and asked Valle Cruz about his travels. Valle Cruz said he was returning from New York, where he and his girlfriend had tried to deliver the Daewoo to a friend named "Herman," but "Herman" was not there anymore. It

---

[1]In their briefs, Alford and the government spell the name "Phaby," as did the person who labeled the videotape. Valle Cruz, the District Court, and the court reporter (hearing transcript) spell it "Phavy." We note that on the Nebraska State Patrol Uniform Citation and Complaint issued in connection with the case (government's hearing exhibit 4), presumably completed by the Trooper himself, and on a Nebraska State Patrol Investigative Report (government's hearing exhibit 7) the name is spelled "Phaby," so that is the spelling we will use.

was at this juncture, about ten minutes after the initial stop, that Phaby made his first contact with the driver of the Daewoo, Angelina Alford. He asked her about their trip. She said they had been in New York about a week to visit friends, and she slept most of the time. She did not mention "Herman" or the plan to give away the car. Phaby testified at the hearing that it appeared to him that Alford was coming down from drugs, or perhaps she was just tired. He did not check her license or registration, but he did tell her to "sit tight." Phaby returned to the SUV where he asked Valle Cruz how long they had been in New York; he said two days.

Phaby told Valle Cruz that he was free to go, but then said he had some more questions, if Valle Cruz did not mind. Valle Cruz denied having drugs, weapons, or large sums of cash in the SUV and nodded affirmatively when Phaby asked if he could search the Expedition. Valle Cruz stepped out of the vehicle, and Phaby did a protective pat-down search. He then called for a drug-detection dog to sniff the SUV before he conducted a physical search of the vehicle. This was approximately fifteen minutes into the stop. When Phaby asked Valle Cruz who had rented the Daewoo, Valle Cruz answered, "That's her car." Phaby then went to the Daewoo to advise Alford that the dog was on the way and once more told her to "sit tight" and he would get them out of there in a minute. He also asked her if she had any questions. Again, he did not check her license or registration.

In the next ten minutes or so, while waiting for the drug-detection dog, Valle Cruz announced to Phaby that Alford was hungry. Phaby responded that he had just talked to her, she was fine, and she said she was going to wait for him. Phaby's suspicions were aroused by Valle Cruz's attempt to have Alford leave the scene after the drug dog was called, so he went to the Daewoo and asked Alford if he could run her license. She said she did not care. Phaby took the license, returned to his patrol car, and called in the license information. While he was waiting for the results of the license check, the canine handler and his dog arrived, about thirty-five minutes after the SUV was stopped. Phaby returned to the Daewoo to tell Alford to "stand tight,"

that they wanted to run the dog around the car as well as the SUV. She said no, that she was "fine," and that she had done nothing wrong. He told her again to "sit tight" and returned to his patrol car where he received the report on her license check. Her criminal history included drug charges. At about the same time, the dog alerted on the center console of the Expedition. Phaby then decided to detain Alford as well as Valle Cruz, believing that he had sufficient probable cause with the drugs found in the SUV and the fact that Valle Cruz and Alford were traveling together. Phaby nevertheless called the county attorney and told him, among other things, that Alford's criminal history showed a "positive Triple I [Interstate Identification Index] for drugs and stuff like that." The attorney verified that Alford could be detained.

The troopers conducted a cursory search of the SUV, focusing on the console, and found a plastic bag containing a small amount of a white substance that they believed to be methamphetamine. The substance later field-tested positive for cocaine. Phaby arrested Valle Cruz.

The canine handler then attempted to walk his dog around the Daewoo. Alford interfered with the dog sniff by sticking her head out the car window and shouting at the handler. The handler pulled the dog away because the dog was then more interested in biting Alford than sniffing for drugs. The dog did not alert on the Daewoo. After the failed attempt to walk the drug dog around the car, Phaby asked Alford to open the trunk, then to step out of the car, to unlock and open the door, and to give him the keys. She refused and asked for Phaby's supervisor. Phaby made another call to the county attorney and updated him on what had happened. Phaby then reported to Alford that he had been told he had probable cause to search her car. After a verbal tussle, including a threat by Phaby to arrest Alford for obstruction of justice, Alford got out of the car. Within a minute or two, the troopers found a crack pipe with a white residue in it on the driver's side floorboard, and Phaby arrested Alford.

Both vehicles were towed to a body shop where troopers conducted a thorough search. In a suitcase in the trunk of the Daewoo they found approximately 2.2 pounds of cocaine. Valle Cruz and Alford were charged with possession of cocaine with intent to distribute. Both filed motions to suppress.

The Magistrate Judge held a hearing on the motions. Ruling from the bench, he concluded that the initial stop of Valle Cruz for speeding was supported by reasonable suspicion, that Valle Cruz consented to the search of the SUV, and that Alford was not illegally detained (seized) by Phaby. But the Magistrate Judge also decided that the search of the Daewoo was not supported by probable cause. He recommended denying the motion to suppress the drugs found in the Expedition but granting the motions to suppress the crack pipe and the 2.2 pounds of cocaine retrieved from the Daewoo, as well as incriminating statements that Alford made after her arrest. The District Court, in a written memorandum and order, agreed with the Magistrate Judge's recommendation and overruled the government's objections. The United States appeals, maintaining that Phaby had the necessary probable cause to search the Daewoo.

The Supreme Court announced the "automobile exception" to the Fourth Amendment's warrant requirement in Carroll v. United States, 267 U.S. 132 (1925), and has since explained that automobiles are excepted for two primary reasons. First, a car's mobility makes it "a fleeting target for a search." Chambers v. Maroney, 399 U.S. 42, 52 (1970). Second, drivers and passengers have lower expectations of privacy in motor vehicles because of "the pervasive regulation of vehicles capable of traveling on the public highways." California v. Carney, 471 U.S. 386, 392 (1985). A warrantless search of a car will be constitutionally valid, however, only if it is supported by probable cause. Ornelas v. United States, 517 U.S. 690, 693 (1996).

We review for clear error the District Court's findings of historical fact, id. at 699, about which there is virtually no dispute in this case because most of those facts

are evidenced on at least the audio portion of the videotape. We review de novo the ultimate conclusion regarding probable cause. Id.

The government challenges three of the District Court's factual findings: that Phaby did not receive the information about Alford's criminal history until after her arrest; that Alford "was almost immediately told by the officer to 'stay here, don't go anywhere,'" Memorandum and Order at 2; and that the initial search of the Daewoo followed the stop by two hours, instead of less than one. We have reviewed the videotape and agree that these findings are clearly erroneous. Alford concedes the errors, but she and Valle Cruz contend that the errors were not outcome determinative on the issue of probable cause.

"Articulating precisely what . . . 'probable cause' mean[s] is not possible." Ornelas, 517 U.S. at 695. Probable cause (and reasonable suspicion) are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." Id. at 696. Thus the probable-cause determination is made after looking at the totality of relevant circumstances and applying a "common sense approach." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). Ultimately, probable cause exists in a case such as this one when a reasonably prudent person would look at the facts and circumstances and believe "that contraband or evidence of a crime will be found" if a vehicle were to be searched. Ornelas, 517 U.S. at 696. After a careful review, we conclude that the collective facts and circumstances in this case were such that Phaby had developed sufficient probable cause to search the Daewoo when the search finally took place.

In January 2005, Phaby had been a highway patrol trooper since 1999, most of those years in Nebraska. During that time, he had received specialized instruction in drug interdiction, including training on "[i]ndicators and how to search vehicles properly." Hearing Transcript at 7. Over the years he had made thousands of traffic stops. In our review, we are to consider this training and experience and give "due

weight" to any inferences Phaby was able to draw from the facts known to him. Ornelas, 517 U.S. at 699. We recap those facts now.

When Phaby first made contact with Alford, he found her to be sleepy, and he suspected illegal drug use. The stories that Valle Cruz and Alford separately told Phaby about their cross-country trip had some inconsistencies—how much time they had spent in New York and why they were there. Cf. United States v. Ameling, 328 F.3d 443, 449 (8th Cir.) (holding that "apparently false statements and inconsistent stories" from a driver and a passenger questioned separately by officers contributed to the officers' correct conclusion that they had probable cause to search a vehicle), cert. denied, 540 U.S. 961 (2003). We agree that the differences were minor and perhaps even reconcilable, had Phaby made the attempt. And if that was all Phaby had in the end upon which to find probable cause to search the car Alford was driving, it would not be sufficient. But we do not look at individual facts in isolation. Instead, as we have said, we consider the **totality** of the circumstances. And Phaby had more than inconsistencies in travel details when he made his final probable-cause decision.

It is clear from the videotape (and he so testified at the hearing) that Phaby's suspicion was piqued when Valle Cruz, after the canine unit had been called, suddenly announced that Alford was hungry, although she had not told Phaby she was hungry when he had spoken with her. Phaby reasonably inferred that Valle Cruz wanted Alford to leave the scene of the traffic stop before the drug-detection dog arrived. It was at this time that he finally decided to find out who she was and to check her criminal history. Even before the results of the license check came back, Phaby knew that Alford did not want the drug dog to sniff her car. And when the report came back, Phaby learned that Alford had a substantial criminal history that included drug charges. The District Court's clearly erroneous finding on when this information became known to Phaby is an error of consequence in our probable-cause analysis. Cf. United States v. Vinson, 414 F.3d 924, 930 (8th Cir. 2005) (citing an affiant's

knowledge of a defendant's previous drug offenses in holding that a warrant authorizing a search for drugs was supported by probable cause).

At about the time Phaby received the information about Alford's criminal history, drugs were found hidden in the SUV that Valle Cruz had been driving. At that moment, Phaby's knowledge of Alford's previous criminal drug charges became all the more relevant to the question of probable cause. Moreover, other facts already known to Phaby took on greater significance in the probable-cause determination. The Expedition and the Daewoo, Valle Cruz and Alford, were traveling together. The two were not mere acquaintances or friends but boyfriend and girlfriend. Their driver's licenses showed the same address for both. They had been together, according to Valle Cruz, for about two years, and Alford was three to four months' pregnant. While "mere propinquity," whether on the highway or in living arrangements, to another who is "independently suspected of criminal activity does not, *without more*, give rise to probable cause to search," we have here, as we have chronicled, the "more" that is required. Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (emphasis added); cf. United States v. Owens, 101 F.3d 559, 561 (8th Cir. 1996) (noting the concurrent arrival and departure and the tandem driving of vehicles in concluding that officers had reasonable suspicion "that the entire group was acting in concert to achieve a criminal objective"), cert. denied, 520 U.S. 1220 (1997).

Phaby's contacts with the county attorney, where he discussed nearly all the facts and circumstances we have recounted here, demonstrate his subjective good faith in making his probable-cause determination. We know that good faith alone does not constitute probable cause. United States v. Ross, 456 U.S. 798, 808 (1982). "That faith must be grounded on facts within knowledge of the [officer], which in the judgment of the court would make his faith reasonable." Id. (citations to quoted cases omitted) (alteration in Ross). The facts of this case demonstrate an objectively reasonable good faith on the part of Phaby.

-8-

A determination of probable cause became a foregone conclusion when the canine handler tried to run the drug dog around the Daewoo despite Alford's opposition, and she interfered to such an extent that the dog had to be pulled away so he would not bite her. After that, Phaby asked Alford to get out of the car and she resisted for several minutes, locking herself in the car. By then, Phaby's determination that he had probable cause to search the Daewoo was objectively reasonable. See Ornelas, 517 U.S. at 696 (stating that in assessing a determination regarding probable cause, we view the facts "from the standpoint of an objectively reasonable police officer"). The District Court erred in holding otherwise.

In her brief, Alford argues that the District Court mistakenly concluded that she was not illegally seized. For its part, the government states, "Neither Defendant filed objections below nor filed a cross-appeal. Accordingly, the only matter at issue in this appeal is whether law enforcement had probable cause to search the Daewoo which Alford was driving." Brief of Appellant at 2–3. In response, Alford maintains that she did not appeal the District Court's decision that she was not illegally seized by Phaby "because this Court reviews that determination de novo in any event." Brief of Appellee Alford at 10. That is not correct. It is the District Court's conclusion that Phaby did not have probable cause to search the Daewoo—the basis for the suppression order from which the government appeals—that we review de novo. But the government's assertion also is incorrect.

A cross-appeal by Alford would have been futile. Our jurisdiction arises under 18 U.S.C. § 3731, not 28 U.S.C. § 1291 as the government maintains in its brief.[2] We

---

[2]The relevant portion of 18 U.S.C. § 3731 reads:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . , not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the

have no authority to hear a cross-appeal—or a direct appeal, for that matter—from either defendant at this stage of the case. Cf. United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994) (deciding the government's appeal of a suppression order but declining to entertain a cross-appeal from an order denying the defendant's motion to dismiss an indictment). The right of interlocutory appeal from a district court's decision on a motion to suppress is the government's alone. We believe, however, that it makes sense, for reasons of judicial economy if nothing else, to address an argument presented to the District Court and raised in an appellee's brief in a § 3731 appeal if the issue would "provide an alternative basis for affirming the order of suppression." United States v. Shameizadeh, 41 F.3d 266, 267 (6th Cir. 1994) (citing cases); see also United States v. Carter, 884 F.2d 368, 374 (8th Cir. 1989) (affirming suppression order on an issue not raised by the defendant but supported by the record). We therefore will address Alford's argument that she was illegally seized, reviewing "the question of whether a seizure has occurred de novo and the district court's determination of voluntariness for clear error." United States v. Mendoza-Cepeda, 250 F.3d 626, 628 (8th Cir. 2001).

The facts demonstrate that at some point in the traffic stop, Alford was indeed seized by law enforcement. Alford argues that the seizure occurred when Phaby first spoke with her, that this seizure was without the required reasonable suspicion, and that the seizure was therefore illegal. See Florida v. Bostick, 501 U.S. 429, 433–34 (1991) (noting that reasonable suspicion is required for a seizure to be constitutionally sound). We disagree.

---

United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

By contrast, 28 U.S.C. § 1291 confers jurisdiction on the courts of appeals only for appeals from "final decisions of the district courts."

One very important—and undisputed—fact in our analysis is that Alford voluntarily pulled her vehicle over to the side of the road, presumably to wait for Valle Cruz, with full knowledge that he had been stopped by law enforcement. Granted, she did not pull over directly behind or in front of the Expedition and the patrol car, but Phaby neither compelled nor even suggested that she was or should be a part of the initial traffic stop. Phaby brought the vehicles closer together after he found out, almost immediately, that the woman driving the Daewoo was Valle Cruz's girlfriend and the two were obviously traveling together. He testified that he did this "for officer safety." Hearing Transcript at 14. Indeed, Phaby was "authorized to take such steps as were reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). Eventually, some ten minutes into the stop, Phaby walked up to the Daewoo for the first time to ask Alford a few questions, but he did not ask for Alford's identification or any other documentation. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Bostick, 501 U.S. at 434 (citation omitted) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

But Alford contends that Phaby's comment to "sit tight" altered the consensual nature of the encounter. According to Alford, the expression "sit tight," when spoken by a uniformed officer, "is a direct order any reasonable person would obey under any circumstance." Brief of Appellee Alford at 12. We cannot agree. As we have said, we have reviewed the videotape, and while the camera did not record this first encounter with Alford (the Expedition was blocking the view), the audio portion of the tape is clear. Phaby's comment was spoken as a colloquialism to be understood by the reasonable person to mean something more on the order of "be patient while we finish up here," not "you are being detained." It was not a "command" or an "edict" from a "gun-toting Trooper." Id. Phaby did not use "language or tone of voice

-11-

indicating that compliance with [his] request might be compelled." <u>Mendoza-Cepeda</u>, 250 F.3d at 628 (citations to quoted cases omitted). Even the District Court, which erroneously found that Phaby told Alford at his first contact, "[S]tay here, don't go anywhere," determined that Alford was not illegally seized.[3] We conclude that Phaby's comment to Alford to "sit tight," when taken in context, was not the sort of "physical force or show of authority" that would have converted the encounter into a seizure. <u>Bostick</u>, 501 U.S. at 434 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968)). By the later time when Alford was seized by Phaby, there had developed, at the very least, a reasonable suspicion of criminal activity.

We affirm the District Court's holding on the issue of Alford's seizure. But for the reasons stated, we reverse the order granting suppression and remand the case for further proceedings.

_____

---

[3]It was to Valle Cruz, not Alford, that Phaby said, "Stay right here. Don't go anywhere yet," just before he approached the Daewoo for the first time.