JAMES E. GRITZNER, Senior Judge *881 This matter comes before the Court on a Motion for Summary Judgment (the Motion) pursuant to Federal Rule of Civil Procedure 56 filed by Defendants Southwest Iowa Narcotics Enforcement Task Force (Task Force), Pottawattamie County Deputy Sheriff Brian Miller (Miller), Assistant Pottawattamie County Attorney Shelly Sedlak-Sudmann (Sudmann), and the Pottawattamie County Attorney's Office (PCAO) (collectively, Defendants). Plaintiff Phillip Anthony Flora (Flora or Plaintiff) resists the motion. The Court held a hearing on the Motion on October 6, 2017. Attorneys Alex Grasso and Michelle Rodemyer were present for Defendants, and attorneys Glen Downey and Nathan Mundy were present for Flora. The matter is fully submitted and ready for disposition.
I. BACKGROUND[1]
A. The Traffic Stop
Flora's action, which comprises five claims under 42 U.S.C. § 1983 and a supplemental state law claim for conversion, stems from a traffic stop that occurred shortly before 2:00 p.m. on August 27, 2015. Flora was driving a Toyota Camry with Tennessee license plates in the westbound lane of Interstate 80 outside Council Bluffs, Iowa. Flora alleges that he had set the cruise control to 70 miles-per-hour-the posted speed limit on that stretch of the interstate-when he was observed by Miller. Miller was parked in his patrol car, facing westbound traffic, at the same time and in the same area as Flora when Flora passed him. In addition to serving as a Pottawattamie County Deputy Sheriff, Miller is a trained drug interdiction officer, a K-9 handler, and a member of the Task Force. Miller activated his emergency lights and initiated a stop of Flora. Flora alleges that Miller's speed radar equipment was not engaged at any point during his pursuit and stop of Flora and, in fact, a radar reading does not appear in Miller's unredacted patrol car video.[2]
Miller approached Flora's passenger side window and informed him that he had been traveling 74 miles-per-hour. Miller requested Flora's driver's license, registration, and proof of insurance.[3] Miller began to question Flora about his occupation and travel itinerary. Flora replied that he worked in information technology and had flown into Cedar Rapids, Iowa the day prior. Flora stated that he was planning on meeting a client "off the freeway" in Omaha, Nebraska, yet did not know which exit to take and would call his client when he got close.[4] Defs' SUF ¶ 20, ECF No. 22-1; Pl's RSUF ¶ 20, ECF No. 70-1. Flora *882 stated for a second time that he did not know his intended exit, though he was less than ten minutes from the Omaha area.[5]
Within minutes of the initial stop, Miller returned to his patrol car to review the documents that Flora had provided to him. Miller observed that Flora had rented the vehicle on August 27, 2015 at 8:49 a.m. in Cedar Rapids, and the vehicle needed to be returned in Huntington Beach, California on August 29, 2015 at 9:00 a.m., with the total cost of the rental being $1,535.90. Miller checked Flora's information and vehicle on the National Crime Information Center (NCIC). Miller completed and printed a traffic warning memorandum for Flora. Miller spent between seven and seven and one-half minutes reviewing Flora's documents and printing the warning before returning to Flora's vehicle. Upon returning to Flora's vehicle, Miller did not return Flora's paperwork and warning memorandum, but instead asked if Flora had anything illegal in his car, which Flora denied. Miller informed Flora, "I have a narcotics dog, I'm going to take him around your car real quick."[6] Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:10-14:00:20). Miller asked Flora if he had been "back to Iowa before," to which Flora replied that he had been once before, "maybe a year ago." Pl's SAF ¶ 10, ECF No. 70-2; Defs' RSAF ¶ 10, ECF No. 73; Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:23-14:00:33).
Before running his drug dog, Francesco, around Flora's rental car, Miller instructed Flora to exit the vehicle. Flora exited the vehicle without objection. Miller informed Flora, "I'm going to pat you down here real quick," to which Flora responded "Yeah," and Miller completed the pat down. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:40-14:00:47). No weapons or contraband were found on Flora's person. Miller commented, "We just get a lot of stuff being moved around, this is a major interstate," to which Flora responded, in audible part, "Yeah, no problem."[7] Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:47-14:00:51). Miller again stated, "I'm going to run my dog around your car real quick." Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:51-14:00:54). Miller asked Flora about his customer, and the two briefly conversed about Flora's business. For a third time, Miller informed Flora that he was going to run Francesco around Flora's car, stating "Just stay right there and I'm going to move him around." Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:01:15-14:01:18). Flora at no point objected to Miller performing the dog sniff. Miller then walked Francesco along Flora's car. Francesco alerted by *883 sitting outside the rental car's trunk. Flora acknowledges that Francesco alerted but alleges that Miller triggered the alert by gesticulating wildly and pulling something from behind his back to show Francesco when the dog approached the rear bumper. Miller's unredacted patrol car video shows that Miller looped Francesco twice in a circle around his body, that Miller moved his arms in an ambiguous fashion as he walked Francesco counterclockwise around Flora's rental car, and that, after Francesco sat behind the car's trunk, Miller reached behind his back and presented something to the dog. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:01:35-14:02:05). The trunk was later revealed to be empty.
Miller allowed Flora to get back into his vehicle and placed Francesco in his patrol car. Miller retrieved Flora's documents and warning memorandum and returned to Flora's vehicle. Flora alleges that, for a second time, Miller asked if he had anything illegal in his car, which Flora denied. Miller then handed Flora his documents and requested Flora's consent to search the vehicle. Flora refused to consent to the interior search. Miller informed Flora that Francesco had alerted to drugs and that he had probable cause to search Flora's vehicle. Flora exited the vehicle, and Miller began his interior search.
After Miller began searching the passenger compartment, he asked Flora if there was a large amount of cash in the car. Flora acknowledged there was a large amount of cash in the backseat. Flora alleges that he told Miller the cash would be used to purchase a customer list from his Omaha client. Miller's search revealed $120,090 in U.S. currency, bundled together with rubber bands, packaged in vacuum-sealed bags, wrapped in several grocery bags, and placed inside an Igloo-brand cooler. Flora alleges that the roadside search revealed no contraband, and Miller's incident report does not indicate such a discovery.
B. Flora's Arrest
After locating the currency, Miller requested backup from Pottawattamie County Deputy Sheriff Eric Shea, who arrived on the scene at approximately 2:10 p.m. Miller then returned to his patrol car and telephoned Sudmann. Sudmann prosecutes civil asset forfeiture cases in Pottawattamie County and provides legal advice to officers in the field on civil forfeiture. Miller told Sudmann that Flora was driving a rental car that cost in excess of $1500 for a two-day trip from Cedar Rapids to Huntington Beach. Miller relayed that he had located a large amount of cash in Flora's rental car, which he believed was packaged as if it was drug related, though Flora was adamant that the money was related to his business and otherwise refused to answer questions about the cash. Miller also told Sudmann that Flora said he was meeting a client off the interstate in Omaha, that Miller's drug dog alerted, and that Flora had refused to consent to a search of his car. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:27:50-14:30:20). Sudmann advised Miller that he could seize Flora's cash and vehicle and to transport them to the Pottawattamie County Sheriff's Office (PCSO).
After the call with Sudmann, Miller advised Flora that he was "detaining Flora and Flora's vehicle for an expanded search of the vehicle." Defs' SUF ¶ 37, ECF No. 22-1; Pl's RSUF ¶ 37, ECF No. 70-1. Miller then read Flora his Miranda rights.[8] Flora refused to answer any questions and requested an attorney. Miller instructed Flora to wait with Deputy Shea while Miller again telephoned Sudmann.
*884 C. Seizure of Flora's Cash
At approximately 2:36 p.m., Task Force Officers Ken McClure and Bob Christensen arrived at the scene. Together, the officers transported Flora and Flora's vehicle to the PCSO.[9] There, the officers conducted a more thorough search of Flora's car. Miller stated that, during this search, he found a small amount of a green, leafy substance, which tested positive for marijuana in a field-testing kit before he threw the test kit away.[10] Miller stated that he also disposed of the substance tested by the kit. Flora alleges that no photographs were taken of the marijuana or positive test kit, and the record contains no photographs of the kit or the supposed contraband.[11] After Flora refused to answer additional questions about the packaged cash, Miller determined that Flora was engaged in criminal activity and that the seized money was forfeitable, and Flora was given a "Notice of Seizure of Property for Forfeiture Under Iowa Law." Defs' SUF ¶¶ 48-49, ECF No. 22-1; Pl's RSUF ¶ 49, ECF No. 70-1. Flora alleges that no marijuana or other illegal substance was ever in his rental vehicle.
The Task Force is an interdepartmental agency made up of individuals from various law enforcement agencies in southwest Iowa, including the Council Bluffs Police Department and the Pottawattamie County Sheriff's Department. The Task Force conducts drug law investigations, enforcement, and prosecution efforts. The Task Force is the agency responsible for conducting civil asset forfeiture investigations, including deposits and distributions. Decisions on whether to pursue civil forfeiture are made jointly by the Task Force Board of Directors and the county attorney responsible for prosecuting the forfeiture case. In the event of a successful prosecution of a forfeiture action initiated by a Task Force member, the initial distribution is as follows: 10% to the State of Iowa, 20% to the county attorney, and the balance retained by the Task Force. A secondary distribution schedule is followed with respect to the balance retained by the Task Force if, at any time, the Task Force Unit Supervisor determines that the forfeited funds available to the Task Force become "excessive": 60% of the Task Force balance to the Council Bluffs Police *885 Department, 20% to the Pottawattamie County Sheriff's Department, 10% to the Mills County Sheriff's Department, and 10% to the Department of Narcotics Enforcement. Flora alleges that the PCAO has a drug forfeiture fund with a balance that can exceed $1 million, which is used to pay for, inter alia, office products and equipment, credit card and cell phone bills, attorney travel and training, and CLE registration fees.
D. The Civil Forfeiture Complaint
On September 3 and 4, 2015, respectively, Flora filed a demand for a probable cause hearing and Sudmann filed an In Rem Forfeiture Complaint in the Iowa District Court for Pottawattamie County, pursuant to Iowa Code § 809A. Meanwhile, on September 24, 2015, the U.S. District Court for the Central District of California issued a Writ of Execution against Flora pursuant to a $148,310 unsatisfied judgment the Federal Trade Commission (FTC) obtained against Flora for violating the Federal Trade Commission Act (FTCA). Sudmann filed a motion to determine the disposition of Flora's cash based on the federal writ. The Pottawattamie County District Court interpreted Sudmann's motion as a motion to dismiss the forfeiture complaint. There was no final adjudication on the merits of the In Rem action.
Pursuant to its exclusive jurisdiction under Iowa Code § 809A.7, the Pottawattamie County District Court dismissed the forfeiture action and directed that Flora's cash be returned to him no later than October 23, 2015, in the presence of U.S. Marshals. On October 20, 2015, U.S. Marshals served the FTC's writ on the Task Force. Task Force officers Christensen and Bob Brietzke met U.S. Marshals at the U.S. Bank in Council Bluffs where the money was located and delivered a cashier's check made payable to the U.S. Treasury in the amount of $120,090. Flora alleges that Sudmann coordinated with FTC officials to execute on the funds before Flora could reacquire his cash. On January 1, 2016, Flora filed an affidavit in the U.S. District Court for the Central District of California, formally waiving his right to request a hearing on, or claim an exemption to, the FTC's execution on his money and waiving any objection to his counsel satisfying an attorney's lien held against the money.
E. Section 1983 Lawsuit
Flora filed this action alleging six claims against Defendants. Flora's action comprises five claims under 42 U.S.C. § 1983 and a supplemental state law claim for conversion. Count I alleges that Miller violated Flora's Fourth Amendment rights by unreasonably seizing Flora and searching Flora's car. Count II alleges that Miller, Sudmann, and the PCAO violated Flora's Fourth Amendment rights by falsely arresting Flora. Count III alleges that Defendants violated Flora's Fourth Amendment rights by unlawfully seizing $120,090 in U.S. currency from Flora. Count IV alleges that Defendants violated Flora's due process rights based on improper financial motivation in seizing Flora's property for civil forfeiture. Count V alleges a facial due process challenge against Iowa Code § 809A.17, a provision of Iowa's civil forfeiture law that allows for forfeiture share agreements between law enforcement and county attorneys. Count VI alleges that Defendants are liable for conversion for failing to return Flora's $120,090 pursuant to a court order. Flora seeks compensatory damages against all Defendants, punitive damages against Miller and Sudmann, and injunctive relief. Defendants move for summary judgment on all claims.
*886 II. DISCUSSION
A. Standard for the Motion for Summary Judgment
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.' " Id. (quoting Celotex, 477 U.S. at 324, 106 S.Ct. 2548 ). The Court views the facts presented on summary judgment in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, a genuine issue for trial requires more than "some metaphysical doubt as to the material facts." Torgerson, 643 F.3d at 1042 (quoting Matsushita, 475 U.S. at 586, 106 S.Ct. 1348 ).
B. Qualified Immunity Standard
"Qualified immunity shields a government official from liability and the burdens of litigation unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Wright v. United States, 813 F.3d 689, 695 (8th Cir. 2015). Determining whether a government official is entitled to qualified immunity involves a two-step inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. (citing Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). The official is entitled to qualified immunity "unless the answer to both of these questions is yes." Burton v. St. Louis Bd. of Police Comm'rs, 731 F.3d 784, 791 (8th Cir. 2013) (citation and internal quotation marks omitted). The Court can "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S.Ct. 808.
"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek v. City of Iowa City, 761 F.3d 920, 922 (2014) (quoting Stanton v. Sims, 571 U.S. 3, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) ). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Wright, 813 F.3d at 695 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.' " Plumhoff v. Rickard, --- U.S. ----, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). A clearly established right can be shown through " 'cases of controlling authority in the[ ] jurisdiction at the time of the incident' or through a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that *887 his actions were lawful.' " Wright, 813 F.3d at 695 (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ). The very action at issue need not have previously been held unlawful; rather, "[t]he pertinent inquiry is whether the state of the law at the time gave the official 'fair warning' that such conduct was unlawful in the situation he confronted." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ).
Because qualified immunity provides immunity from suit, this Court must address it as an initial matter. See Pearson, 555 U.S. at 232, 129 S.Ct. 808 ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) ) ). But there are situations where factual disputes preclude an early determination of qualified immunity. "To avoid summary judgment based on qualified immunity, [Plaintiff] must offer sufficient evidence to show a genuine issue of material fact about whether a reasonable officer would have been on notice that the officer's conduct violated a clearly established right." Wright, 813 F.3d at 695. Defendants are entitled to qualified immunity if, taking the facts in the light most favorable to Plaintiff, the Court finds "there are no material issues of fact and [Defendants'] actions were objectively reasonable in light of the law and the information [they] possessed at the time." Engleman v. Murray, 546 F.3d 944, 948 (8th Cir. 2008).
C. Count I: Unreasonable Search and Seizure Claim
Count I alleges that Miller is liable under § 1983 for violating Flora's Fourth Amendment right against unreasonable search and seizure with respect to the seizure of Flora and search of Flora's car. Flora alleges that each of Miller's traffic stop, extension of the traffic stop, and search of Flora's rental car violated his Fourth Amendment rights. Defendants argue that Miller is entitled to summary judgment on Count I because the traffic stop was justified by probable cause or reasonable suspicion, the extension of the traffic stop was either not unreasonably prolonged or justified by consent or reasonable suspicion, and the search was justified by probable cause. Alternatively, Defendants argue that Miller is entitled to qualified immunity for each of the traffic stop, the extension of the traffic stop, and the search of Flora's car.
1. Unreasonable Seizure: The Initiation of the Traffic Stop
Flora alleges that Miller's traffic stop violated his Fourth Amendment rights because Miller lacked probable cause to stop him. Flora alleges that he was not speeding before he was pulled over. Defendants argue that Miller had probable cause or reasonable suspicion to initiate the traffic stop because Miller clocked Flora at 4 miles-per-hour over the posted speed limit, and regardless, he is entitled to qualified immunity.
As noted, the Court has discretion as to which step of the qualified immunity inquiry to address first. Pearson, 555 U.S. at 236, 129 S.Ct. 808. The Court begins its inquiry by considering whether Miller's traffic stop violated clearly established law at the time of the traffic stop.
The Fourth Amendment, as applied to the states through the Fourteenth Amendment, protects the right of people to be secure "against unreasonable searches and seizures." U.S. Const. amend IV. "A traffic stop constitutes a seizure under the Fourth Amendment." United States v. $45,000.00 in U.S. Currency, 749 F.3d 709, 715 (8th Cir. 2014) (quoting *888 United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) ). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (quoting Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ). "Any traffic violation, however minor, provides probable cause for a traffic stop." Id. (quoting United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) ). Whether an officer's traffic stop is pretextual is irrelevant. Whren, 517 U.S. at 812-13, 116 S.Ct. 1769. "[T]he critical inquiry in a probable-cause determination in the traffic-stop context is what the stopping officer observed before pulling over a motorist." $45,000.00 in U.S. Currency, 749 F.3d at 715.
Officers need only reasonable suspicion to justify a traffic stop. United States v. Gaffney, 789 F.3d 866, 868 (8th Cir. 2015). "Reasonable suspicion exists when an officer has a 'particularized and objective basis for suspecting the particular person stopped of breaking the law.' " Id. (quoting Heien v. North Carolina, --- U.S. ----, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014) ). The determination of whether reasonable suspicion existed looks at "what the officer reasonably knew at the time," id. (citation omitted), and "in the light of the officer['s] 'experience and specialized training,' " United States v. Yang, 345 F.3d 650, 655 (8th Cir. 2003) (citation omitted). "Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop." Gaffney, 789 F.3d at 868 (citation omitted). "Mistakes of law or fact, if objectively reasonable, may still justify a valid stop." Id. (citation omitted).
In Gaffney, which was decided shortly before the events giving rise to this lawsuit, the Eighth Circuit noted that it "ha[d] not resolved whether an officer's visual estimate of speed alone can furnish either probable cause or reasonable suspicion to stop a vehicle." Id. (emphasis added). Thus, in making the reasonableness determination, the court considered "whether the totality of the circumstances at the time of the stop supports the reasonableness of the officer's belief that Gaffney was speeding at all. " Id. The court answered that question in the affirmative, after considering the officer's familiarity with the area, the officer's belief that the driver was speeding, an admission by the driver that he braked hard immediately after the officer turned to follow him, and evidence that the driver had been traveling 0.8 miles-per-hour over the speed limit. Id. at 868-70. The court reasoned that despite the officer's inexperience issuing speeding citations, lack of use of speed radar equipment, late night timing of the stop, and speed estimate that was 15 to 20 miles-per-hour greater than the driver's actual speed, the totality of the circumstances at the time of the stop supported the reasonableness of the officer's belief that the defendant was speeding "at all." Id. at 869-72.
Flora alleges that he had engaged cruise control at 70 miles-per-hour, the speed limit through the relevant section of Interstate 80, at the time Miller observed and stopped him. Flora submits that Miller's speed radar equipment was never engaged during his pursuit of Flora, and in fact, Miller's patrol car video does not show a radar reading for Flora's car. Flora also disputes Miller's contention that he clocked Flora before initiating his radar recording equipment. However, Flora acknowledges that Miller observed his car while Miller was parked and facing westbound traffic. At no point in either his brief or record materials does Flora contest the notion that Miller, at minimum, visually estimated Flora's speed; he merely contests Miller's use of equipment.
*889 Viewing the facts in the light most favorable to Flora as the Court must, Miller's traffic stop of Flora did not violate clearly established law. Miller, at the least, visually estimated Flora to be traveling 4 miles-per-hour over the speed limit. Additional factors bolstered Miller's visual estimate. The parties agree that Miller was facing westbound traffic at the same time and in the same area as Flora when Flora passed him, and Miller's unredacted patrol car video shows that the weather was clear at the time of the stop. Moreover, the record contains no evidence regarding the proper and accurate operation of the cruise control in Flora's rental car such that, even if set at 70 miles-per-hour, cruise control would have precluded a greater speed of just a few miles-per-hour. Even if Flora's cruise control had kept Flora's speed within the 70 miles-per-hour posted speed limit, Miller was entitled to make a "reasonable but mistaken judgment[ ]" so long as his determination that Flora was speeding was not "plainly incompetent." See Blazek, 761 F.3d at 922 (quoting Stanton, 134 S.Ct. at 5 ). Miller's visual speed estimate and the speed at which Flora admitted traveling were off by a mere 4 miles-per-hour-far less than the officer's 15 to 20 miles-per-hour speed estimate disparity in Gaffney. 789 F.3d 866, 868. The Court concludes that under the totality of the circumstances, Miller's traffic stop based on a visual estimate of speed no more than 4 miles-per-hour greater than the speed Flora admitted traveling, with no external circumstances compromising Miller's visual estimate, did not violate clearly established law. Thus, with respect to the traffic stop, Miller is entitled to qualified immunity.
2. Unreasonable Seizure: Extension of the Traffic Stop
Flora alleges that Miller's extension of the stop violated his Fourth Amendment right against unreasonable seizures. Flora argues that Miller prolonged the stop without Flora's consent or reasonable suspicion, and in so doing, violated his clearly established Fourth Amendment rights.[12] Defendants argue that Miller did not violate Flora's Fourth Amendment rights with respect to the extension of the stop because the stop was not unreasonably prolonged, Flora consented to the extended stop, and Miller had reasonable suspicion that Flora was engaged in criminal activity. Alternatively, Defendants contend that Miller is entitled to qualified immunity for the allegedly prolonged stop.
Here, the Court begins its qualified immunity inquiry by first considering whether Miller violated Flora's Fourth Amendment rights. "A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, --- U.S. ----, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'-to address the traffic violation that warranted the stop and attend to related safety concerns." Id. (internal citations omitted) (quoting Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ). The traffic stop may "last no longer than is necessary to effectuate th[at] purpose." Id. (alteration in original) (citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are-or reasonably should have been-completed." Id.
*890 "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " Id. at 1615 (alteration in original) (quoting Caballes, 543 U.S. at 408, 125 S.Ct. 834 ). Such inquiries involve checking the driver's license, determining the existence of outstanding warrants, and inspecting the automobile's registration and proof of insurance-"checks [that] serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. It is also routine for officers to ask the vehicle's occupants about their "destination, route, and purpose." Peralez, 526 F.3d at 1119 (citation omitted).
"A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' "[13] Rodriguez, 135 S.Ct. at 1615 (alteration in original) (citation omitted). "The critical question ... is not whether the dog sniff occurs before or after the officer issues a ticket, ... but whether conducting the sniff 'prolongs'-i.e. , adds time to-'the stop.' " Id. at 1616. In Rodriguez, the Court determined that because conducting a dog sniff "exceed[ed] the time needed to handle the matter for which the stop was made," the stop constituted an unreasonable seizure. Id. at 1612. Thus, an officer may not, in the context of a moving violation, conduct a dog sniff that "prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual," id. at 1615, or "unless the continued encounter is consensual," United States v. Munoz, 590 F.3d 916, 921 (8th Cir. 2010) (citation omitted).
Upon stopping Flora, Miller informed him that the stop related to Flora's driving over the speed limit. Miller questioned Flora about his occupation and travel itinerary. These inquiries were routine and permissible. See Rodriguez, 135 S.Ct. at 1615 ; Peralez, 526 F.3d at 1119. Following this line of questioning, Miller returned to his patrol car and spent between seven and seven and one-half minutes reviewing Flora's documents, checking Flora's information and vehicle on NCIC, and preparing a warning memorandum-which again, were routine and permissible actions. See Rodriguez, 135 S.Ct. at 1615 ; Peralez, 526 F.3d at 1119. However, Miller then ran his drug dog around Flora's car. This inquiry was unrelated to the purpose of resolving a moving violation and resulted in the traffic stop being longer than was necessary to effectuate its purpose, given that Miller had already completed Flora's warning memorandum for the moving violation. Thus, Miller's extension of the stop to conduct a dog sniff constituted an unreasonable seizure unless it was consensual or justified by reasonable suspicion.
Defendants argue that the prolonged stop was consensual, and thus, did not violate Flora's Fourth Amendment rights. An officer may prolong a traffic stop if the encounter becomes consensual. United States v. Garcia, 613 F.3d 749, 753 (8th Cir. 2010) ("If the encounter becomes consensual it is not a seizure, the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle." (citation and internal quotation marks omitted) ). "Whether an encounter is consensual depends on the facts of the case." Munoz, 590 F.3d at 921. "A person is seized within the *891 meaning of the Fourth Amendment when, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." Id. (citation and internal quotation marks omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." United States v. Carpenter, 462 F.3d 981, 985 (8th Cir. 2006) (quoting Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ). "Circumstances of a seizure may include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Munoz, 590 F.3d at 921 (citation omitted). "Conversely, if a reasonable person feels free to 'disregard the police and go about his business,' the encounter is consensual." Id. (quoting Bostick, 501 U.S. at 434, 111 S.Ct. 2382 ).
Miller did not ask, but instead informed, Flora that he was going to "take [Francesco] around your car real quick," a statement which elicited no response from Flora. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:10-14:00:20). Miller then instructed Flora to exit the vehicle, and Flora exited without objection. Miller informed Flora that he was going to "pat you down here real quick," Flora responded, "Yeah," and Miller completed the pat down. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:40-14:00:47). Miller then commented, "We just get a lot of stuff being moved around, this is a major interstate," to which Flora replied, "Yeah, no problem." Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:00:47-14:00:51). Miller informed Flora two more times that he was going to run his drug dog around Flora's car without Flora objecting.
During the prolonged stop, Miller issued multiple instructions or declarations that were not framed as requests. There is "a constitutionally significant distinction between an official command and a request that may be refused." United States v. Grant, 696 F.3d 780, 785 (8th Cir. 2012) (quoting United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006) ). However, an officer's declaratory statements, "when taken in context," are not necessarily "the sort of 'physical force or show of authority' that would have converted the encounter into a seizure." United States v. Valle Cruz, 452 F.3d 698, 701, 706 (8th Cir. 2006) (quoting Bostick, 501 U.S. at 434, 111 S.Ct. 2382 ) (holding that an officer repeatedly telling a suspect to "sit tight" in anticipation of and during a dog sniff, despite the suspect saying "no" and that "she had done nothing wrong," was not a "command," "edict," or "language ... indicating that compliance with [his] request might be compelled" (citations omitted) ). Miller at no point exhibited threatening behavior, and Miller did not display a weapon.[14] Nor did Miller's tone suggest that compliance was compelled. Miller's statements did not consist only of instructions, as Miller also inquired about Flora's last visit to Iowa *892 and the nature of Flora's business. Taken in context, Miller's declarations regarding the dog sniff put Flora on notice of what Miller intended to do during their prolonged encounter, and a reasonable person in Flora's position would not have understood them to be commands amounting to a show of authority. See Grant, 696 F.3d at 785. Moreover, after complying with Miller's instruction to wait on the roadside while Miller conducted the dog sniff, Flora refused to consent to Miller's request to search his vehicle. This suggests that Flora was aware that he could refuse to consent to the dog sniff as well, as "a citizen's refusal of consent to search tends to show that a reasonable person would know he is not required to comply with an officer's requests .... [and] that it was possible for him to say 'no.' "[15] Id. at 786.
Although Flora did not unambiguously consent to the dog sniff, the Court must consider whether the encounter was consensual based on the "totality of the circumstances." See Munoz, 590 F.3d at 921. Though a close question, the Court concludes that a reasonable person in Flora's position would have believed that he was free to leave at this stage of the encounter, given Miller's non-threatening behavior, Miller's repeated notices of his intent to conduct a dog sniff and Flora's repeated failure to object, and Flora's use of consensual language as "no problem."[16] See Garcia, 613 F.3d at 753 (holding that defendant's "behavior indicated he felt free to leave," following an officer's question unrelated to a traffic stop, when defendant leaned into officer and answered the officer's question). Thus, Miller's prolongation of the encounter to conduct a dog sniff was consensual. Because prolonged stops are lawful if consensual, Miller's prolonged stop did not violate Flora's Fourth Amendment rights. The Court need not consider whether Miller had reasonable suspicion to prolong the stop. See United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002) (holding that if an encounter is consensual, then even without reasonable suspicion, the officer may make inquiries unrelated to the stop).
Even were this Court to find that the prolonged encounter was not consensual, Miller would nonetheless be entitled to qualified immunity. The Eighth Circuit has not clearly established that officers must frame all statements as requests which can be refused, when the surrounding context is non-threatening and cooperative. See Valle Cruz, 452 F.3d at 706. Moreover, Miller was entitled to make "reasonable but mistaken judgments." See Blazek, 761 F.3d at 922 (quoting Stanton, 134 S.Ct. at 5 ). Miller's belief that the prolonged encounter was consensual was reasonable, given Flora's cooperation, his use of language as "no problem," and his failure to *893 object to the dog sniff despite three opportunities to do so.
3. Unreasonable Search: Miller's Search of Flora's Car
Flora alleges that Miller's search of his vehicle, including its containers, the trunk, and Flora's wallet, without Flora's consent, was unreasonable and violated his Fourth Amendment rights. Defendants argue that Miller had probable cause for the search because Francesco, a trained and certified drug dog, alerted to the presence of narcotics in the vehicle.[17] Flora counters that Francesco's alert was not reliable because Miller cued Francesco's alert and because of Francesco's record of false alerts.
Here, the Court begins its qualified immunity inquiry by first considering whether Miller's search of the car violated Flora's Fourth Amendment rights. Pursuant to the automobile exception to the warrant requirement, a police officer has probable cause to search a vehicle when the totality of circumstances warrants an officer of reasonable caution in the belief that contraband or evidence of a crime is present.[18] Florida v. Harris, 568 U.S. 237, 243-44, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) ; United States v. Gonzalez, 781 F.3d 422, 429 (8th Cir. 2015). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search," United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017) (quoting United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ), "including a passenger's personal belongings," id. (citing Wyoming v. Houghton, 526 U.S. 295, 302, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999) ). The alert of a reliable drug detection dog can by itself generate probable cause to search an automobile. Harris, 568 U.S. at 246-47, 133 S.Ct. 1050. "With regard to the reliability of drug dogs, '[t]he better measure of a dog's reliability ... comes away from the field, in controlled testing environments,' " and "[f]or that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." United States v. Gunnell, 775 F.3d 1079, 1085 (8th Cir. 2015) (first and second alterations in original) (quoting Harris, 568 U.S. at 246, 133 S.Ct. 1050 ). "Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog.' " United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010) (quoting United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994) ). This Court must inquire "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Harris, 568 U.S. at 248, 133 S.Ct. 1050.
In Harris, the Supreme Court chided the use of "hit" and "miss" lists for determining drug dog efficacy:
Errors may abound in such records.... Field data ... may not capture a dog's false negatives. Conversely ... if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden.
*894 Id. at 245, 133 S.Ct. 1050. The Court concluded that "[f]ield data ... may markedly overstate a dog's real false positives," and therefore, "[t]he better measure of a dog's reliability thus comes away from the field, in controlled testing environments." Id. at 246, 133 S.Ct. 1050. The Court established a rebuttable presumption: "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Id. at 246-47, 133 S.Ct. 1050. "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." Gonzalez, 781 F.3d at 429 (citing Harris, 568 U.S. at 246-48, 133 S.Ct. 1050 ). One such circumstances surrounding a drug dog's alert that can undermine the case for probable cause is when "the officer cued the dog (consciously or not)." Harris, 568 U.S. at 247, 133 S.Ct. 1050. In Harris, the Court determined that a drug dog's alert established probable cause, given that the dog had completed a 120-hour training program in narcotics detection two years earlier and the dog and its handler were subject to continuing training, and given that there were no special circumstances that gave the Court reason to discount the dog's alert to the vehicle. Id. at 248-50, 133 S.Ct. 1050.
In the present case, Defendants argue that Francesco was a reliable drug dog because he was a properly certified K-9 at the time of the traffic stop. Defendants have presented evidence that Francesco was subject to continuous training since his initial certification in December 2008, including annual re-certifications since January 2010. Flora has not challenged these certifications. However, the Court must also consider the circumstances surrounding Francesco's alert. Id. at 247, 250, 133 S.Ct. 1050. Flora alleges that the circumstances surrounding Francesco's alert give this Court reason to discount the alert as a basis for probable cause because Miller cued Francesco's alert to Flora's vehicle. Miller's patrol car video shows that Miller moved his arms in an ambiguous fashion while leading Francesco counterclockwise around Flora's vehicle. Additionally, Miller reached behind his back and presented something to Francesco after Francesco sat behind the car's trunk. Pl's App. 106, ECF No. 70-3 (Unredacted Miller Patrol Car Video 14:01:35-14:02:05). Officer cueing can undermine the case for probable cause, Harris, 568 U.S. at 247, 133 S.Ct. 1050, and Defendants have presented no evidence to counter Flora's claim that Miller's gestures amounted to cueing. Whether Miller cued Francesco's alert represents a genuine issue of material fact in determining whether Miller had probable cause to search Flora's car. Thus, the Court cannot conclude that Miller's search did not violate Flora's Fourth Amendment rights.
Defendants, at oral argument, asserted that the Harris case should not affect Miller's entitlement to qualified immunity, because the Supreme Court's guidance on handler cueing did not clearly establish a right against searches subsequent to the alert of a cued drug dog. The Supreme Court has clearly stated that, even for otherwise reliable drug dogs, a handler cueing the dog, consciously or not, can undermine the case for probable cause, and thus by implication defeat the justification to conduct a warrantless search of an automobile. Id. Since Harris, the Eighth Circuit has not considered a case involving handler cueing. However, the court has held that circumstances surrounding a drug dog's alert can overcome the rebuttable presumption that an alert provides probable cause to search. See *895 Gonzalez, 781 F.3d at 429. Additionally, in United States v. Simeon, 115 F.Supp.3d 981 (N.D. Iowa 2015), the district court conducted a comprehensive inquiry into "alleged cueing behavior" in determining whether probable cause was undermined, which included consideration of whether the officer allowed the drug dog to "work" independent of the officer's motions, and whether the dog's alert preceded the officer's alleged cueing gestures. Id. at 1001-02 ; see also United States v. Poole, No. CR13-3003-MWB, 2013 WL 1694776, at *14-15 (N.D. Iowa Apr. 18, 2013) (considering alleged cueing by officer in determining the reliability of a drug dog's alert as a basis for probable cause).
On the record currently before this Court, in light of the admonition in Harris that handler cueing can undermine the case for probable cause, as well as the Eighth Circuit's holding that circumstances surrounding an alert can overcome the rebuttable presumption established in Harris , this Court finds that Miller had "fair warning" against conducting a warrantless vehicle search based solely on an alert triggered by handler cueing. See Wright, 813 F.3d at 695 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034 ). Based on clearly established law at the time Miller conducted his dog sniff of Flora's car, a reasonable officer in the same circumstances would have known that a deliberately cued drug dog did not provide probable cause to search the car. Assessing the facts in the light most favorable to Flora as the Court must, there is a genuine issue of material fact as to whether Miller triggered Francesco's alert and thus fabricated a basis for searching Flora's car in violation of Flora's Fourth Amendment rights, which would not have constituted a "reasonable but mistaken judgment[ ]." See Blazek, 761 F.3d at 922 (quoting Stanton, 134 S.Ct. at 5 ). The Court must conclude on the current motion that Miller is not entitled to qualified immunity with respect to the search of Flora's car.
4. Summary of Motion as to Count I
Because Miller is entitled to qualified immunity with respect to the traffic stop of Flora and did not violate Flora's Fourth Amendment rights in prolonging the stop, Miller is entitled to summary judgment with respect to Flora's claim of unreasonable seizure of his person in Count I. Because genuine issues of material fact remain relating to the circumstances of Francesco's alert, and specifically, whether Miller triggered the alert through handler cueing, Miller is not entitled to summary judgment with respect to the search of Flora's car.
D. Count II: False Arrest Claim
Count II alleges that Miller, Sudmann, and the PCAO are liable under § 1983 for falsely arresting Flora because (1) Flora was detained on the roadside beyond the point necessary to issue a traffic warning, (2) Sudmann aided and encouraged Miller's decision to extend Flora's detention, and (3) the PCAO maintained a practice and policy of instructing officers to detain individuals suspected of possessing large sums of U.S. currency. Defendants argue that (1) Miller's arrest of Flora was either supported by probable cause or Miller was entitled to qualified immunity, (2) Sudmann is entitled to qualified or absolute immunity for her role in Flora's arrest, and (3) the PCAO is not liable because of the absence of individual liability.
1. Miller
Defendants argue that Miller's discovery of $120,090 in U.S. currency and Francesco's alert established probable cause for the arrest.[19] Defendants argue that, regardless, Miller is entitled to qualified *896 immunity, either for his decision to arrest or because of his reliance on Sudmann's legal advice. Flora argues that Miller is not entitled to qualified immunity for relying on the advice of Sudmann because factual issues remain as to whether Miller provided Sudmann with complete information during their phone call.[20]
The Court begins its qualified immunity inquiry here by considering whether Miller violated Flora's Fourth Amendment rights. The Fourth Amendment requires that arrest warrants and warrantless arrests be supported by probable cause. Maryland v. Pringle, 540 U.S. 366, 369-70, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). "Probable cause exists when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). Probable cause is assessed under the totality of the circumstances. Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999). In the probable cause analysis, law enforcement officers must receive " 'substantial latitude in interpreting and drawing inferences from factual circumstances,' but such latitude is not without limits." Id. (internal citation omitted) (quoting United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997) ). "[P]robable cause does not exist when a minimal further investigation would have exonerated the suspect." Id. (internal quotation marks omitted).
The Eighth Circuit has identified direct and circumstantial evidence that supports probable cause that a suspect is engaged in the crime of drug trafficking. One illustrative case is United States v. $141,770.00 in U.S. Currency, 157 F.3d 600 (8th Cir. 1998). In that case, the court determined that there was probable to believe a suspect's money was connected to drug trafficking, given (1) the suspect possessed a large amount of cash, suspiciously packaged in scented fabric softener sheets, and sealed in three layers of zip-lock bags; (2) a drug dog alerted to the seized money; (3) the suspect was driving a camper that had originated in California, a drug-source state, and was returning to California with a large amount of cash after having spent time in the upper Midwest, a drug destination area; and (4) the suspect gave false statements regarding the packaging materials and failed to produce records regarding the source of the money. Id. at 603-04 ; see also United States v. $124,700 in U.S. Currency, 458 F.3d 822, 826 (8th Cir. 2006) (holding that a large sum of cash, concealed in aluminum foil inside a cooler, carried by a suspect who had flown cross-country on a one-way plane ticket, was returning in a rented vehicle, and had given unclear or false statements to officers, and a drug dog's alert established a substantial connection between drug trafficking and cash found in vehicle); United States v. $39,878.00, 80 F.3d 317, 319 (8th Cir. 1996) ("[W]e have recognized that possession of a large amount of cash (here, nearly $40,000) is strong evidence that the cash is connected with drug trafficking.");
*897 United States v. U.S. Currency, in Amount of $150,660.00, 980 F.2d 1200, 1206-07 (8th Cir. 1992) (citing suspect's possession of a large amount of currency wrapped with rubber bands, a drug dog's alert to the currency, and suspect's inconsistent statements concerning the presence of money as evidence supporting probable cause that cash is connected with drug activity).
It is undisputed that, upon searching Flora's car, Miller discovered $120,090 in U.S. currency, bundled together with rubber bands, packaged in vacuum-sealed bags, wrapped in several grocery bags, and placed inside an Igloo-brand cooler. The discovery of $120,090 was more than three times the $40,000 that the Eighth Circuit has deemed "strong evidence that the cash is connected with drug trafficking." $ 39,878.00 in U.S. Currency, 80 F.3d at 319. The suspicious packaging of the cash-bundled with rubber bands, placed in vacuum-sealed bags, wrapped in additional layers, and placed inside a cooler-further supported probable cause that Flora was engaged in drug trafficking. See $124,700 in U.S. Currency, 458 F.3d at 826 ; $141,770.00 in U.S. Currency, 157 F.3d at 603 ; $ 150,660.00 in U.S. Currency, 980 F.2d at 1206. Flora had flown on a one-way ticket to Iowa and planned to return cross-country by rental car to California-a travel itinerary similar to itineraries that the Eighth Circuit has deemed indicia of drug trafficking. See $124,700 in U.S. Currency, 458 F.3d at 826 ; $141,770.00 in U.S. Currency, 157 F.3d at 603. Flora was also unable to identify his intended interstate exit despite being ten minutes from the location where he was to meet his alleged Omaha customer. Even if Francesco's alert is not considered due to the possibility that it was cued, in the aggregate, the amount of the cash, the cash's suspicious packaging, and Flora's vague travel itinerary was sufficient evidence supporting probable cause that Flora was engaged in drug trafficking. Thus, Miller's arrest did not violate Flora's Fourth Amendment right against unreasonable seizures, and Miller is entitled to summary judgment on Count II.[21] Because *898 Miller is not liable for false arrest, the Court does not need to address whether qualified immunity based on advice from counsel applies
2. Sudmann
Defendants argue that Sudmann is entitled to summary judgment on Count II because Sudmann was protected under absolute immunity for giving advice to Miller concerning the initiation of a forfeiture action pursuant to Iowa Code § 809A. Defendants further argue that Sudmann is, at minimum, entitled to qualified immunity because Sudmann advised Miller during an active investigation. Flora responds that Sudmann is not entitled to absolute immunity because her advice to Miller related neither to her role as prosecutor nor to her function as an advocate for the State, and that she is not entitled to qualified immunity because her advice contravened clearly established law.
"Prosecutors are entitled to absolute immunity from civil liability under § 1983 when they are engaged in prosecutorial functions that are intimately associated with the judicial process." Schenk v. Chavis, 461 F.3d 1043, 1046 (8th Cir. 2006) (citation and internal quotation marks omitted). These include deciding which suits to bring, the initiation and pursuit of prosecution, and the presentation of a state's case at trial. Imbler v. Pachtman, 424 U.S. 409, 424-25, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) ; Anderson v. Larson, 327 F.3d 762, 768 (8th Cir. 2003). Even "patently improper" actions connected with a prosecution are immunized. Schenk, 461 F.3d at 1046 (citation omitted). A prosecutor will not be entitled to absolute immunity before there is probable cause to arrest. McGhee v. Pottawattamie Cty., 547 F.3d 922, 929 (8th Cir. 2008) ; see also Burns v. Reed, 500 U.S. 478, 492, 495-96, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (holding that, although participating in a probable cause hearing entitles a prosecutor to absolute immunity, giving advice to an officer on whether probable cause exists to arrest a suspect does not).
By contrast, a prosecutor is entitled to qualified immunity "when performing actions in an 'investigatory' or 'administrative' capacity." Larson, 327 F.3d at 768 (quoting Imbler, 424 U.S. at 430-31, 96 S.Ct. 984 ). As with officers, qualified immunity *899 shields prosecutors from § 1983 liability "unless their conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Id. at 769 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ).
Sudmann's phone call with Miller constituted advice on whether there was probable cause to arrest Flora, which does not entitle Sudmann to absolute immunity for Flora's false arrest claim. See Burns, 500 U.S. at 496, 111 S.Ct. 1934. However, Sudmann's probable cause inquiry was action in an investigatory capacity, and her ultimate advice to Miller that Flora be arrested did not violate Flora's Fourth Amendment rights. Miller informed Sudmann over the phone that he had discovered a large sum of cash, packaged as if it was drug-related, and that his drug dog had alerted. Based upon Miller's depiction of the events to Sudmann, Miller had probable cause to arrest Flora, and therefore Sudmann advising Miller to do so did not violate a clearly established right. Sudmann is thus entitled to qualified immunity and to summary judgment on Count II.
3. The PCAO
Defendants argue that the PCAO is entitled to summary judgment on Count II because a municipality cannot be liable unless there is first individual liability against a municipal actor-and because neither Miller nor Sudmann are liable for false arrest, the PCAO cannot be liable for false arrest. Flora failed to resist the motion for summary judgment as to the PCAO on Count II.
Flora's failure to resist the motion as to Count II against the PCAO is alone grounds to grant the motion. See L.R. 56(b), (c) (stating that a party resisting summary judgment must "respond[ ] to each of the grounds asserted in the motion for summary judgment," and "[i]f no timely resistance to a motion for summary judgment is filed, the motion may be granted without prior notice from the court"). Nonetheless, the PCAO is entitled to summary judgment because the claim fails on the merits.
"A municipality may not be held liable under section 1983 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.' " Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir. 2008) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ). Two basic circumstances warrant Monell liability:
1) where a particular municipal action itself violates federal law, or directs an employee to do so, and 2) where a facially lawful municipal action has led an employee to violate a plaintiff's rights and the municipal action was taken with deliberate indifference as to its known or obvious consequences.
Id. (citations and internal quotation marks omitted). With respect to the first circumstance, "no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability." Moyle v. Anderson, 571 F.3d 814, 818 (8th Cir. 2009). With respect to the second circumstance, municipal liability does not attach "unless individual liability is first found on an underlying substantive claim." Schoettle v. Jefferson Cty., 788 F.3d 855, 862 (8th Cir. 2015). Flora has identified no PCAO policy that itself violates the Fourth Amendment or directs its employees to do so, nor has individual liability been found for false arrest. Therefore, no municipal liability can be attached, and the PCAO is entitled to summary judgment on Count II.
E. Count III: Illegal Seizure Claim
Count III alleges that Defendants are liable under § 1983 for illegally seizing *900 Flora's property-$120,090 in cash-in violation of Flora's Fourth Amendment rights. Defendants argue that Miller's seizure was supported by probable cause, or alternatively, Miller is entitled to qualified immunity, that Sudmann is entitled to qualified or absolute immunity for her advice, and that the Task Force and PCAO cannot be liable, either because of the absence of underlying individual liability or because of entitlement to qualified immunity.
1. Miller
Defendants argue that Miller is entitled to summary judgment on Count III because he had probable cause to seize Flora's cash, or alternatively, he is entitled to qualified immunity. Flora argues that probable cause did not support Miller's seizure of the cash pursuant to Iowa Code § 809A, as there remain disputed issues of material fact relating to the evidence cited by Miller as supporting probable cause for the seizure.
The Court begins its qualified immunity inquiry here by considering whether Miller violated Flora's Fourth Amendment rights. The Fourth Amendment protects the right of persons to be "secure in their persons, houses, papers, and effects" against unreasonable seizures. U.S. Const. amend. IV. A seizure occurs when " 'there is some meaningful interference with an individual's possessory interests' in the property seized." PPS, Inc. v. Faulkner Cty., 630 F.3d 1098, 1102 (8th Cir. 2011) (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ). "[T]he Fourth Amendment does not prohibit all unwarranted seizures, only unreasonable ones." Id. at 1103. A warrantless seizure of property is reasonable under the Fourth Amendment if an officer has probable cause to believe that the property is forfeitable contraband and if the seizure occurs in a public place. Florida v. White, 526 U.S. 559, 565, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999) ; see also United States v. Milham, 590 F.2d 717, 720 (8th Cir. 1979) (holding that the seizure of a van by Drug Enforcement Agency agents pursuant to 21 U.S.C. § 881(a) - (b), which permits the warrantless seizure of a vehicle when there is probable cause to believe that it has been used to facilitate the sale of illegal drugs, was reasonable).
Under Iowa Code § 809A.6(2), "[p]eace officers may seize property for forfeiture without process on probable cause to believe that the property is subject to forfeiture ... and if exigent circumstances exist." Property is subject to forfeiture if the property is either "[f]urnished or intended to be furnished by a person in an exchange that constitutes conduct giving rise to forfeiture" or "[u]sed or intended to be used in any manner or part to facilitate conduct giving rise to forfeiture." Iowa Code § 809A.4(2)(a)(1)-(2). "Property" means "anything of value." Iowa Code § 809A.1(5). Conduct giving rise to forfeiture includes "[a]n act or omission which is a public offense and which is a serious or aggravated misdemeanor or felony." Iowa Code § 809A.3(1)(a).
Defendants argue that, as with Flora's false arrest claim, a reasonable officer with training and experience in drug interdiction would have concluded that Flora's cash related to drug trafficking, and thus, Miller's seizure was supported by probable cause. Defendants cite the currency's suspicious packaging, Francesco's discretionary alert to the cash at the PCSO, and Miller's discovery of a green, leafy substance in Flora's rental car, which tested positive for marijuana. Flora alleges that there was no positive drug test, as the record contains no picture of the kit or evidence of the green, leafy substance that Miller claims to have discovered during his search of Flora's car. Flora disputes Miller's account of the discretionary sniff test *901 at the PCSO, which is not visible in either Miller or Deputy Shea's patrol car videos. Flora contends that vacuum-sealed cash alone could not support probable cause for seizure.
Though Flora correctly highlights several disputed issues of fact-the reliability of Francesco's roadside alert, the circumstances of the officers' discretionary station house sniff test, and the existence of a positive drug test-these are not material to Flora's unreasonable seizure claim. The Court's probable cause analysis for Miller's warrantless arrest of Flora is identical to the probable cause analysis for Miller's warrantless seizure of Flora's property pursuant to Iowa Code § 809A.[22] As explained above, Miller had probable cause to believe that Flora was engaged in drug trafficking. Miller discovered a large sum of cash that was suspiciously packaged, and Flora presented a suspicious travel itinerary. Although an undisputed drug dog alert and a positive drug test would have provided additional indicia supporting probable cause, such indicia were not necessary given the weight of the remaining evidence. Miller had probable cause to believe Flora's cash was forfeitable contraband under Iowa Code § 809A, and the seizure occurred on the interstate, a public place. See White, 526 U.S. at 565, 119 S.Ct. 1555. Thus, Miller did not violate Flora's Fourth Amendment right against unreasonable seizures. Miller is entitled to summary judgment on Count III.
2. Sudmann
Defendants argue that Sudmann is entitled to summary judgment on Count III because Sudmann's advice to Miller to seize Flora's cash did not violate Flora's Fourth Amendment right against unreasonable seizures, as Sudmann relied on facts from which a reasonable person could conclude that Flora's money was used in or derived from drug trafficking. They further argue that Sudmann is entitled to absolute immunity for refusing Flora's demand that the money be returned because Sudmann was advocating on behalf of the State in a pending probable cause hearing. Flora argues that Sudmann's advice was not intimately associated with the judicial process. Flora further argues that Sudmann is not entitled to qualified immunity because her advice to seize the cash without probable cause violated Flora's clearly established Fourth Amendment rights.
The same law regarding a prosecutor's entitlement to qualified or absolute immunity that is discussed above in Count II applies here. After Miller informed Sudmann of the additional evidence that Miller allegedly discovered at the station house, Sudmann determined that Flora's cash should be seized for civil forfeiture pursuant to Iowa Code § 809A. This reflected both a decision on which type of lawsuit to file and the initiation of a civil forfeiture prosecution. See Imbler, 424 U.S. at 424, 96 S.Ct. 984 (prosecutors are entitled to absolute immunity when "deciding which suits to bring"); Larson, 327 F.3d at 768 (prosecutors are entitled to absolute immunity *902 for the "initiation and pursuit of a criminal prosecution"). Thus, Sudmann is entitled to absolute immunity from civil liability for the seizure of Flora's cash and to summary judgment on Count III.
3. The Task Force and PCAO
Defendants argue that the Task Force and PCAO are entitled to summary judgment on Count III because there is no underlying liability against a government official (either Miller or Sudmann, respectively). They argue that, regardless, the Task Force is entitled to qualified immunity for relying on Sudmann's legal advice to continue seizing Flora's cash. Flora failed to resist the Task Force and PCAO on Count III.
As with Flora's false arrest claim, municipal liability does not attach unless the Task Force and PCAO maintained a municipal policy which itself violated federal law or a facially lawful municipal action led Miller and Sudmann to violate Flora's rights. See Seymour, 519 F.3d at 800. Flora has not identified a Task Force or PCAO policy which itself violates the Fourth Amendment or directs an employee to do so, nor has individual liability been found for the seizure of Flora's cash. Therefore, no municipal liability can be attached, and the Task Force and PCAO are entitled to summary judgment on Count III.
F. Due Process Claims
Count IV alleges that Defendants violated Flora's due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. Because Defendants had a financial incentive to seize and retain Flora's cash, Flora argues, Defendants acted with unconstitutional bias in stopping Flora, seizing his assets, and deeming them subject to forfeiture.[23] Count V asserts a facial challenge against, and seeks enjoinment of, Iowa Code § 809A.17, which allows for entities like the Task Force and PCAO to share in the proceeds of civil forfeiture. Flora argues that this statute violates due process by incentivizing local law enforcement to indiscriminately seize property for forfeiture. Defendants argue that they are entitled to summary judgment on Count IV because the Task Force/PCAO forfeiture share agreement does not create unconstitutional incentives. Defendants further argue that they are entitled to summary judgment on Count V, as § 809A.17 allows for forfeiture share agreements that do not offend due process.
1. Count IV: Improper Financial Incentive
Defendants argue that none of them have the personal authority to render a final disposition of Flora's seized assets; rather, it is the sole prerogative of Iowa district courts. Defendants also assert that forfeited assets are divided according to official capacity. Flora responds that unconstitutional bias is pervasive in Pottawattamie County because of the built-in financial incentives of the forfeiture share agreement between the Task Force and PCAO. He argues that, though prosecutors are accorded deference with respect to legislative schemes that provide incentives to secure civil penalties, such deference is not absolute. Relying on *903 Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) and Marshall v. Jerrico, Inc., 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), Flora alleges that the Task Force/PCAO share agreement resulted in a violation of his due process rights. Defendants argue that Flora misreads these precedents.
"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall, 446 U.S. at 242, 100 S.Ct. 1610. The neutrality requirement in adjudicative proceedings helps to guarantee "that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." Id. For example, when either a judge or his court can financially benefit from conviction, neutrality is compromised and due process is violated. See Tumey, 273 U.S. at 532, 47 S.Ct. 437 (holding unconstitutional a local ordinance directing that a town mayor personally profit by receiving "his costs in each case, in addition to his regular salary, as compensation" for convicting defendants who appeared before him); see also Ward v. Vill. of Monroeville, 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (invalidating a procedure by which sums produced from a mayor's court substantially bolstered municipal revenues, even though the mayor's salary did not increase, because "possible temptation" remains present "when the mayor's executive responsibilites [sic] for village finances may make him partisan to maintain the high level of contribution from the mayor's court").
In contrast to the neutrality and impartiality requirements placed on officials performing judicial or quasi-judicial functions, wide discretion is accorded to prosecutors. Marshall, 446 U.S. at 248, 100 S.Ct. 1610. "Prosecutors need not be entirely neutral and detached," and in an adversarial system, "are necessarily permitted to be zealous in their enforcement of the law." Id. (citation and internal quotation marks omitted). A state legislature "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." Id. at 249, 100 S.Ct. 1610 (quoting Tumey, 273 U.S. at 535, 47 S.Ct. 437 ).
The Due Process Clause nonetheless imposes limits on prosecutorial conduct. Id."[T]raditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." Id. A scheme that injects "a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." Id. at 249-50, 100 S.Ct. 1610. The Supreme Court has declined to state with precision "what limits there may be on a financial or personal interest of one who performs a prosecutorial function." Id. at 250, 100 S.Ct. 1610. However, in conducting its due process analysis, the Court has considered whether government officials stand to profit economically from vigorous enforcement, whether the officials' salaries are fixed by law, and whether there is a realistic possibility that the officials' judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts. Id.
In Marshall, the Supreme Court assessed whether the collection of civil penalties for the unlawful employment of child labor pursuant to § 16(e) of the Fair Labor Standards Act (FLSA) by the now-former Employment Standards Administration (ESA) violated the Fifth Amendment's Due Process Clause.
*904 Id. at 239, 100 S.Ct. 1610. The Court determined that the possibility of assistant regional administrators maintaining a financial or personal interest in the enforcement of § 16(e) was too remote to result in a due process violation. Id. at 250-51, 100 S.Ct. 1610. No government officials stood to profit from vigorous enforcement of § 16(e), and the salaries of assistant regional administrators were fixed by law. Id. at 250, 100 S.Ct. 1610. Moreover, there was no realistic possibility of distorted judgment. Id. The civil penalties collected under § 16(e) represented substantially less than 1% of the ESA's budget. Id. The budget amount returned to the Treasury was substantially greater than the amount collected as civil penalties. Id. at 250-51, 100 S.Ct. 1610. The ESA's regional offices were not financially dependent on maintaining a high level of penalties. Id. at 251, 100 S.Ct. 1610. It was the ESA's national office, and not the regional administrators, that decided how to allocate civil penalties-meaning that the regional administrators had no assurance that the penalties they assessed would return to their offices at all. Id. Finally, the ESA minimized any potential for bias by allocating civil penalties to regional offices in proportion to the expenses incurred by each regional office in investigating and prosecuting child labor violations, and not on the basis of the amount of penalties collected by each regional office. Id.
Iowa Code § 809A.17 enables law enforcement and prosecutorial entities like the Task Force and PCAO to structure forfeiture share agreements. Under the relevant agreement, in the event of a successful civil forfeiture initiated by a Task Force member and prosecuted by the PCAO, 10% of the initial distribution flows to the State of Iowa, 20% to the PCAO, and the balance is retained by the Task Force. Although the Task Force attempts to check "excessive" forfeitures by following a secondary distribution schedule, whether forfeitures become excessive rests on the sole determination of the Task Force Unit Supervisor, what constitutes an excessive sum for forfeiture is not clarified in the agreement, and the secondary distribution only applies to the Task Force's allocated share from the initial distribution. The structure of the Task Force/PCAO civil forfeiture agreement is such that, with successful prosecutions of forfeitures not deemed excessive, the Task Force and PCAO are guaranteed to profit economically as penalties will flow to their offices. Cf. Marshall, 446 U.S. at 251, 100 S.Ct. 1610. Additionally, the Task Force/PCAO agreement does not limit forfeiture shares to expenses accrued by the Task Force and PCAO in pursuing the forfeitures in order to reduce the potential for bias. Cf. id. The parties do not dispute that the PCAO maintains a fund which is comprised of the proceeds of successful civil forfeitures. Flora alleges that this fund's balance can exceed $1 million, which is used to pay for expenses including office products and equipment, credit card and cell phone bills, attorney travel and training, and CLE registration fees.
Although state courts have the final say on whether forfeiture is proper in a given case, Iowa Code § 809A.7(4), there remains an issue as to whether Task Force officers, such as Miller, and PCAO prosecutors, such as Sudmann, are so incentivized to enforce Iowa's civil forfeiture law as to distort their judgment. Defendants have failed to produce sufficient evidence on the factors the Supreme Court held were relevant in Marshall. Defendants have failed to establish that forfeitures comprise an insignificant percentage of the Task Force and PCAO budgets, that the Task Force and PCAO are not financially dependent on maintaining a large and continuing stream of forfeiture penalties, as Flora alleges, and that Miller and Sudmann did not stand to profit economically *905 from vigorous enforcement of the law at the time of the seizure of Flora's cash.[24] These are material facts at issue in determining whether Defendants' forfeiture share agreement violated Flora's due process rights, thus precluding summary judgment on Count IV.
2. Count V: Facial Challenge to Iowa Code § 809A.17
Defendants argue that they are entitled to summary judgment on Count V because Iowa law imposes no obligation on Defendants to keep forfeited assets. Defendants note that Iowa law incentivizes municipalities to enforce their common interests, such as clearing state highways of drug trafficking and disgorging traffickers of their illegal profits, and it is for the legislature, not the courts, to change laws that create incentives.[25] Flora argues that the same incentives at issue in Count IV similarly preclude Defendants from summary judgment on Count V.
"A facial challenge to a legislative Act is ... the most difficult challenge to mount successfully." Phelps-Roper v. Ricketts, 867 F.3d 883, 891 (8th Cir. 2017) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ). "[A] party mounting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.' " United States v. Stephens, 594 F.3d 1033, 1037 (8th Cir. 2010) (quoting Salerno, 481 U.S. at 745, 107 S.Ct. 2095 ). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Id. (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ).
Section 809A.17 offers seizing agencies the authority to enter into forfeiture share agreements but leaves the terms of such agreements to the discretion of seizing agencies. See Iowa Code § 809A.17(e)(1)-(2). Iowa Code § 809A.17(e)(2) provides, "The department of justice shall not retain more than ten percent of any forfeited cash. The balance shall be distributed to the seizing agency for use by the agency or for division among law enforcement agencies and county attorneys pursuant to any agreement entered into by the seizing agency." Under this provision, law enforcement and county attorneys can structure agreements that do not offend due process. For example, officers and county attorneys could draw up a share agreement entitling seizing agents to retain only that portion of forfeited assets reflecting expenses accrued, similar to how the penalties were distributed to the ESA regional administrators in Marshall. 446 U.S. 238, 251, 100 S.Ct. 1610.
The fact that Iowa Code § 809A.17 allows for forfeiture share agreements that do not violate due process defeats Flora's facial challenge because Flora cannot establish that Iowa Code § 809A.17 is invalid in all circumstances. See Stephens, 594 F.3d at 1037. "As unconscionable as property *906 seizures from people who have not been charged or convicted of a crime may seem, it is not our function to change the law. 'In a democracy, the power to make the law rests with those chosen by the people.' " In re Prop. Seized for Forfeiture from Thao, No. 14-1936, 2016 WL 1130280, at *9 (Iowa Ct. App. Mar. 23, 2016) (unpublished table decision) (quoting King v. Burwell, --- U.S. ----, 135 S.Ct. 2480, 2496, 192 L.Ed.2d 483 (2015) ). Defendants are entitled to summary judgment as to Count V.
G. Count VI: Conversion Claim
Count VI alleges that Defendants converted Flora's cash by wrongfully taking and detaining the cash. Under Iowa law, conversion is defined as "the wrongful control or dominion over another's property contrary to that person's possessory right to the property." Blackford v. Prairie Meadows Racetrack & Casino, Inc., 778 N.W.2d 184, 188 (Iowa 2010) (citation and internal quotation marks omitted). Conversion is the "civil equivalent" of theft. Iowa v. Hollinrake, 608 N.W.2d 806, 808 (Iowa Ct. App. 2000). "In order to establish a conversion claim, the plaintiff must establish a possessory interest in the property." Blackford, 778 N.W.2d at 188. Among the factors that Iowa courts consider when determining whether interference is sufficiently serious to find conversion are:
(a) the extent and duration of the actor's exercise of dominion or control;
(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
(c) the actor's good faith;
(d) the extent and duration of the resulting interference with the other's right of control;
(e) the harm done to the chattel;
(f) the inconvenience and expense caused to the other.
Kendall/Hunt Publ'g Co. v. Rowe, 424 N.W.2d 235, 247 (Iowa 1988) (quoting Restatement (Second) of Torts § 222A(2) ).
As explained above, Defendants had probable cause to seize Flora's cash pursuant to Iowa Code § 809A. Flora's conversion claim turns on the ultimate disposition of his cash once the State's civil forfeiture action was dismissed. On September 24, 2015, the U.S. District Court for the Central District of California issued a Writ of Execution against Flora, pursuant to a $148,310 judgment delivered against Flora on November 25, 2013. On September 30, 2015, U.S. Marshals served a copy of the writ on Task Force officer Christensen. The PCAO advised Christensen that Flora's property was in the legal custody of the Iowa District Court for Pottawattamie County, and thus, subject only to the orders and decrees of the Iowa court. On October 5, 2015, the State moved to determine disposition of property-a motion that was construed by the Pottawattamie County District Court as a request by the State to dismiss the action and dispose of the property pursuant to the federal writ. On October 6, 2015, Pottawattamie County District Judge Mark Eveloff dismissed the civil forfeiture proceeding against Flora and directed that Flora's seized property be returned to Flora "in the presence of U.S. Marshals to ensure compliance with valid federal process (such as a Writ of Execution) ... by no later than October 23, 2015."[26] Defs' App. 82, ECF No. 22-2. Rather than the cash being returned to Flora, U.S. Marshals served the writ on the Task Force. On October 20, Task Force officers Christensen and Brietzke met U.S. Marshals at the U.S. Bank in *907 Council Bluffs where the money was located and delivered a cashier's check to the U.S. Treasury for the sum of $120,090. Flora alleges that Defendants violated the court order by turning over the seized cash to the FTC instead of Flora.
Though Flora's conversion allegation charges "Defendants," he has presented no evidence suggesting that Miller or the PCAO took individual or municipal action, respectively, to violate the October 6, 2015 court order.
Flora alleges that Sudmann orchestrated the writ's execution through correspondence with FTC officials during the pendency of the forfeiture proceeding. This charge is unavailing. For one, Sudmann's emails regarding the FTC writ were sent prior to the court order, and thus, her conduct cannot be regarded as flouting the order. Moreover, Sudmann expressed reservation about U.S. Marshals seizing Flora's assets directly.
Similarly unavailing is Flora's charge against the Task Force. Flora did not suffer a substantial interference with his "right of control." The Iowa district court ordered that Flora's cash be returned "in the presence of U.S. Marshals" to ensure that the Marshals could immediately execute upon the FTC writ. Defs' App. 82, ECF No. 22-2. There was no "harm done to the chattel," and Flora was not caused significant "inconvenience and expense" given that his repossession of the cash would have been fleeting. The Court is similarly unable to construe Christensen and Brietzke's bank transfer as the "civil equivalent" of theft, given that neither the Task Force nor these officers retained any of Flora's cash.
There is no issue of material fact relating to Flora's conversion claim against Defendants, and thus, Defendants are entitled to summary judgment as to Count VI.
III. CONCLUSION
Based on the foregoing, the Motion for Summary Judgment, ECF No. 22, submitted by Defendants must be granted in part and denied in part . Defendants' Motion must be granted with respect to Plaintiff's Count I (Unreasonable Seizure), Count II (False Arrest), Count III (Unreasonable Seizure of Plaintiff's Property), Count V (Facial Due Process Challenge), and Count VI (Conversion). These claims are hereby dismissed . Defendants' Motion must be denied with respect to Plaintiff's Count I (Unreasonable Search) and Count IV (Due Process Violation).
IT IS SO ORDERED.

The facts here are either materially undisputed or, if genuinely disputed, viewed in the light most favorable to the nonmoving party. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

According to Miller, as Flora passed him, Miller engaged his speed radar equipment and clocked Flora's speed at 74 miles-per-hour. Miller stated in his initial report, dated August 28, 2015, that this reading led him to activate his emergency lights and initiate a traffic stop.

Miller stated that, upon asking Flora to close the driver's side window, he detected a moderate odor of a masking agent inside Flora's vehicle. Flora denies using any air freshener or other masking agent in the vehicle.

According to Miller, Flora stated that his final destination was Omaha. Flora, by contrast, alleges that he never told Miller that his final destination was Omaha, but instead informed Miller that he was visiting a customer in Omaha.

Defendants submit that Flora's carotid artery was pulsating during this initial conversation between Miller and Flora, which Flora disputes.

Defendants have presented evidence that both Miller and his drug dog were certified as K-9 investigators in December 2008 and have been annually re-certified since January 2010.

Flora disputes this and alleges that he actually said "no comment." Though not every word spoken between Miller and Flora is clearly audible in the portion of the unredacted patrol car video covering this point in the encounter, Flora does state "Yeah, no problem" in response to Miller's statement about activity on the interstate. While the Court must view the disputed facts in a light most favorable to Flora, a fact is not genuinely disputed when the record is clear. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendants assert that, upon arriving at the PCSO, Miller and Deputy Shea performed a discretionary sniff test in an adjacent building to confirm Francesco's roadside alert. Miller stated that he first gave Francesco his search command for narcotics in a metal outbuilding located on the PCSO property, and during the search, Francesco never alerted nor indicated to an odor of narcotics. Miller's report then stated that, approximately thirteen minutes later, he instructed Deputy Shea to place Flora's currency at an unknown location within the metal shed search area. Miller stated that he re-deployed Francesco, gave the dog his search command for narcotics, and Francesco alerted by jerking his head, increasing his nasal sniffing near the seam of the cabinet drawer containing Flora's cash, and lying down. Flora denies this account for lack of information, and the discretionary sniff test is not visible in the officers' unredacted patrol car videos.

Miller stated that he disposed of the test kit after a crime scene technician, Katie Pattee, advised him during a conversation they had following Miller's secondary search of Flora's rental car that it was against agency policy to turn in the test kit. The Task Force's policies and procedures provide, "Disposing of contraband no longer of evidentiary value ... will be completed by the Council Bluffs Police Property Section." Pl's App. 88, ECF No. 70-3. Defendants acknowledge there is no crime lab policy to destroy material evidence.

Defendants assert that the test kit can be viewed in Deputy Shea's patrol car video. The patrol car video depicts what appears to be the kit but does not depict a "positive" drug test or the alleged green, leafy substance. Pl's App. 107, ECF No. 70-3 (Unredacted Shea Patrol Car Video 15:23:58-15:27:00).

Flora also argues in his brief that his rights under Article I, § 8 of the Iowa Constitution were violated by the extension of the stop. However, the Complaint does not plead a claim for relief under the Iowa Constitution for this or any other conduct.

A drug dog sniff itself does not constitute a search under the Fourth Amendment, because the sniff "discloses only the presence or absence of narcotics, a contraband item" in which a person maintains no inherent privacy interest. Caballes, 543 U.S. at 409-10, 125 S.Ct. 834 (quoting United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ).

Flora argues that Miller's behavior was threatening, as Miller, a uniformed officer, stood at his passenger window with his side arm visible and the police vehicle's emergency lights flashing in Flora's rearview mirror. These circumstances, however, are incident to even routine traffic stops and do not amount to threatening behavior. See United States v. Drayton, 536 U.S. 194, 204-05, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms.... The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").

Flora argues that Miller never told Flora that he was free to leave. But an officer's failure to inform a driver that he is free to leave does not defeat an otherwise consensual encounter. See United States v. Siwek, 453 F.3d 1079, 1084 (8th Cir. 2006) (holding that the "[officer's] failure to inform [the driver] that he was free to leave ... did not render [the driver's] consent involuntary"). Nor is a police officer obligated to inform a driver of the right to refuse consent. Vera, 457 F.3d at 835 ("There is no per se requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse." (citing Drayton, 536 U.S. at 206-07, 122 S.Ct. 2105 ) ).

Although Miller had not yet returned to Flora his driver's license, registration, and warning memorandum, a consensual encounter is not compromised merely because an officer has not returned a driver's documentation. See Siwek, 453 F.3d at 1084 ("[C]onsent was not the product of coercion merely because [the officer] had not finished his investigation of the driver's license or returned the license to [the driver].").

Defendants justify Miller's search of Flora's rental car solely based on Francesco's alert. Their brief presents no alternative basis for probable cause for the search.

A warrantless search of a vehicle is also justified by consent. See Arizona v. Gant, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) ; Katz v. United States, 389 U.S. 347, 358 n.22, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). But Flora did not consent to Miller searching his vehicle.

Defendants cite as another factor supporting probable cause Miller's discovery at the PCSO of a green, leafy substance in Flora's vehicle that tested positive for marijuana. In addition to this fact being in dispute, a subsequent station house discovery does not enter into the probable cause "totality of the circumstances" calculus for a roadside arrest that preceded the discovery. See, e.g., Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999).

Flora also argues that Miller's stop was a pretext for Miller and the PCAO to seize Flora and to pursue civil forfeiture. This argument is unavailing, as whether an officer's traffic stop is "pretextual" is irrelevant as long as the stop is supported by probable cause. Whren, 517 U.S. at 812-13, 116 S.Ct. 1769.

Flora asserts that Miller's arrest was nonetheless unconstitutional based on the chain of unconstitutional conduct that immediately preceded it: namely, Miller unreasonably prolonging the traffic stop and Miller's unreasonable search. Flora appears to be alluding to the "fruit of the poisonous tree" evidentiary rule. See Utah v. Strieff, --- U.S. ----, 136 S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) ("[T]he exclusionary rule-the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial-.... encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and ... 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.' ") (quoting Segura v. United States, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ). However, the Supreme Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials" and has held that the rule does not apply in grand jury proceedings, civil tax proceedings, civil deportation proceedings, and parole revocation proceedings. Penn. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 363-64, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citing prior Supreme Court cases). Federal courts have widely held that the fruit of the poisonous tree doctrine likewise does not define the scope of a person's Fourth Amendment rights in civil rights lawsuits brought pursuant to § 1983. See, e.g., Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) ("[N]othing within the fruit-of-the-poisonous-tree doctrine suggests that an officer must ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search."); Black v. Wigington, 811 F.3d 1259, 1268 (11th Cir. 2016) ("[T]he exclusionary rule does not apply in a civil suit against police officers.... Accordingly, the officers can rely on the evidence that they found in the [Plaintiffs'] trailer to prove that the arrest warrants were supported by probable cause."); Townes v. City of New York, 176 F.3d 138, 146, 148 (2d Cir. 1999) ("In a § 1983 suit .... [t]he fruit of the poisonous tree doctrine is not available to elongate the chain of causation.... The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all."); Wren v. Towe, 130 F.3d 1154, 1158-59 (5th Cir. 1997) (per curiam) (holding that officers could not be held liable under § 1983 for illegal seizure of a truck when the officers were entitled to qualified immunity for the truck's seizure, even assuming that the officers' preceding search of the truck was illegal); Snider v. Pekny, 899 F.Supp.2d 798, 816 (N.D. Ind. 2012) ("[T]he fact that [officers] are not entitled to qualified immunity for the earlier warrantless search of the pole barn does not necessarily allow claims against them based on subsequent actions that rely on the dug out box recovered during that unlawful search. This is in part because the 'fruit of the poisonous tree' doctrine ... does not apply to civil claims made under § 1983.... [G]overnmental officials are not liable for arrest or prosecution merely because it is premised on evidence obtained in an unlawful search."). The Supreme Court has provided similar reasoning with respect to § 1983 excessive force claims. See Cty. of L.A. v. Mendez, --- U.S. ----, 137 S.Ct. 1539, 1547, 198 L.Ed.2d 52 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional. An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry.... To the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately."). Whether Miller had probable cause or is entitled to qualified immunity for the arrest of Flora must be assessed independent of the circumstances surrounding the initial stop and search of Flora and Flora's car.

To substantiate their arguments relating to Flora's illegal seizure claim, both parties rely on several Iowa appellate opinions. See generally In re Prop. Seized from McIntyre, 550 N.W.2d 457 (Iowa 1996) ; In re Prop. Seized from Daniels, 478 N.W.2d 622 (Iowa 1991) (per curiam); In re Prop. Seized for Forfeiture from Thao, No. 14-1936, 2016 WL 1130280 (Iowa Ct. App. Mar. 23, 2016) (unpublished table decision). The Court does not find these decisions persuasive in its probable cause analysis. These cases assess whether the civil forfeiture determinations of Iowa trial courts were supported by substantial evidence-a standard that is distinct from the Fourth Amendment probable cause standard upon which Flora bases his false arrest and illegal seizure claims under § 1983.

Defendants argue that Flora lacks standing to pursue this claim in federal court because Defendants did not personally profit from the forfeiture of Flora's assets. This argument is unavailing. Flora alleges that he suffered an injury resulting from Defendants' improperly motivated seizure of his property. Defendants' conduct is fairly traceable to the injury that Flora asserts, the loss of his cash, which can plausibly be redressed through an award of damages or injunctive relief. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that Article III standing requires an injury in fact, fairly traceable to a defendant's conduct, that can be redressed by a favorable decision).

Defendants correctly note that Iowa law enforcement officers and county attorneys are subject to salary caps. See Iowa Code § 331.904. But as Flora posits, the potential for salary bias remains with the forfeiture funds theoretically capable of bolstering salaries that would otherwise fall below the caps if not for the added revenue flow.

Defendants also argue that any allegation of unconstitutional incentives has no place in Fourth Amendment analysis because pretextual motives do not generate Fourth Amendment violations where there is probable cause. But Counts IV and V raise due process challenges under the Fifth and Fourteenth Amendments, not challenges under the Fourth Amendment. Cases interpreting the Fourth Amendment, such as Whren, thus do not apply in this context.

The court's dismissal order did not determine the merit, or lack of merit, of the State's seizure of Flora's cash.